IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT CHARLESTON

**FILED**

NOV 1 0 2005

TERESA L. DEPPNER, CLERK
U.S. District & Bankruptcy Courts
Southern District of West Virginia

**DANIEL BERG,**

Plaintiff,

v

Civil Action No. 2:05- 0900

(Hon. _____, District Judge)

# 17463

**JONATHAN HALPERIN**, and
**MOUNTAIN AMERICA, LLC,**
A Maryland Limited Liability Company
d/b/a **WALNUT SPRINGS
MOUNTAIN RESERVE,**

Defendants.

## COMPLAINT

For his Complaint against the Defendant Jonathan Halperin, the Plaintiff, Daniel Berg, hereby

avers, upon information and belief, as follows:

## INTRODUCTION

As stated more fully below, this Complaint is brought to redress damage and injury caused

to the Plaintiff by the Defendant's oppressive conduct, including but not limited to the publication,

upon information and belief, in Kanawha County, West Virginia and elsewhere in the Southern

District of West Virginia and outside of this district, statements that defamed Plaintiff, and intended

defame Plaintiff with malice.  Jonathan Halperin's defamatory in the Southern District of West

Virginia of false statements concerning Plaintiff constitute part of a broader civil and RICO

conspiracy, wherein, *inter alia*, state court process was abused and used wrongfully, and in the

furtherance thereof Jonathan Halperin plotted to shoot, or to get a third party to shoot the Plaintiff,

and in furtherance thereof Jonathan Halperin also either directly or by aiding and/or abetting others

to wrongfully open Plaintiff's United States' mail, and Jonathan Halperin committed wire fraud, and

Jonathan Halperin repeatedly has used ex parte procedures and false and misleading statements to

state courts to get court orders that effectively prevent Plaintiff from exercising his rights as member

of Mountain America and, the ultimate goal of all of which was and continues to be to defraud the

Plaintiff of his interest and membership in a limited liability company called Mountain America, all

to further satiate Defendant Jonathan Halperin's immense and insatiable greed in order to maintain

his increasingly high-spending "lifestyle."

### THE PARTIES

1. Plaintiff Daniel Berg is a resident of the State of California.

2. Defendant Jonathan Halperin is a resident of the District of Columbia.

3. Mr. Berg and Mr. Halperin are equal 50% members of Mountain America, LLC, an LLC created to develop a piece of property called Walnut Springs Mountain Reserve, although control and direction of project forces is Plaintiff's primary responsibility. This property is located within the Southern District of West Virginia.

4. Mountain America, LLC, is a Maryland company created to own property and do business in West Virginia.

5. Plaintiff and Defendant are equal co-members, through their ownership of Mountain America, LLC, of various other LLCs linked to and directly associated with the Walnut Springs Mountain Reserve development.

6. Plaintiff has over twenty years of operational experience in business development and has critical skills directly related to residential development.

7. On the Walnut Springs project, Plaintiff has been overseeing approximately 50 subcontractors & workmen.

8. The success of the Walnut Springs project is directly related to Mr. Berg's vision and ability to make Mountain America a success.

9. Mr. Berg has invented, refined and implemented a new methodology for evaluating, designing and implementing a low-medium density master plan forest community. Plaintiff invested

-2-

over a year beginning in 2003 and $175,000 motor coaching depreciable costs of over $67,000 plus his own costs expenses and salaries to locate this one of a kind location to implement this process. He spent 90 days negotiating the close and profiling the internet site that he owns so that the first day they opened on August 5, 2004, he told a $110,000 lot, 13 acres and within that week sold another 4 properties.

10.     Plaintiff has years of experience in value engineering various requirements regarding residential developments.

11.     Plaintiff implemented the standards of a Cogent Master Planned Forest community in the Walnut Springs project.  This implementation is extremely sophisticated, and involves complex statistical modeling, financial projections and value engineering.  All of the details and phases must be fully integrated and managed across the entire development platform. The fully integrated and managed development plan of the Walnut Springs project are all the result of Mr. Berg's hard and tireless work (he often works over one-hundred hours per week).  Plaintiff's work is the direct cause of the enhanced value of the property in the Walnut Springs project.

12.     Mr. Berg's work is directly responsible for the ability of Mountain America and related companies to justify and make sales of property at a high value per acre, and, concomitantly, ensures a greater value for customers.

13.     Mr. Berg's work also ensures full compliance with various land sales regulations, and the related aspects of complex rules that must be adhered to, including HUD allocation and advertising regulations.

14.     The company must re-engineer its performance every month and refine daily in order to remain in full compliance during each phase of development, work that is performed by Mr. Berg.

15.     Mr. Berg is proficient in the following areas, each of which are critical to the success of the Walnut Springs project: Software and related skills: ArchiCAD, Microsoft Project, Microsoft Word, Microsoft Excel (with up to 30 proformas for each indices), a parcel program, an aerial map program, a topographical map program, GPS usage in the field, GPS usage with the computer, billing management software, and appropriate computer programs for billing, project management, IRS rules/regulations, bank accounting, investor accounting.  To learn the application and interface - and then master the use of this knowledge and apply it to a property development project - requires years experience.  No one else currently employed by Mountain America can operate all of the required and necessary software except Mr. Berg.

16.     Mr. Berg and Mr. Halperin have been associated contractually in the Walnut Springs project since approximately August 3, 2004.

-3-

17. The Mountain America, LLC Provisional Operating Agreement was signed by both Mr. Berg and Mr. Halperin on August 3, 2004 (Ex. 1) and a tract of land comprising hundreds of acres was purchased that day that served as the core property designated for the real estate development project. The project now totals approximately one thousand three hundred (1300) acres.

18. The total cost of all land purchased for the Walnut Springs project held by Mountain America, was approximately $1.5 Million. Mr. Berg has been responsible for selling the land to purchasers. The result of Mr. Berg's extraordinary sales and project design and implementation efforts, where he has regularly worked six or seven days a week for twelve to sixteen hours a day, was to accomplish approximately $12 Million in land sales. The additional six (6) LLCs that make up the 1300 acre community were done without any additional significant financial input from defendant but did require significant input of time and experience and energy by Plaintiff.

19. Defendant Halperin is a Washington, D.C. trial lawyer. He had no operational experience as CEO or COO of any organization, and no experience in residential project operation or development, prior to Walnut Springs.

20. Mr. Halperin's primary function in regard to the Walnut Springs project has been that of investor and legal adviser. He also has provided some sales leads and one minor investor..

## JURISDICTION AND VENUE

21. Plaintiff is a citizen of the State of California, and Defendant is a citizen of the District of Columbia. The matter in controversy exceeds, exclusive of interest and costs, the sum specified in 28 U.S.C. § 1332.

22. This action arises also, *inter alia*, under 28 U.S.C. § 2201, 15 U.S.C. § 1703 (a) (2) (D), and 24 C.F.R. 1710.4 (c), 18 U.S.C. § 1702, and 18 U.S.C. § 1961, *et seq.*, as hereinafter more fully appears.

23. Venue in the United States District Court for the Southern District of West Virginia, Charleston Division is based upon the Defendant publishing defamatory statements about Plaintiff in Kanawha County, West Virginia, and elsewhere in the Southern District of West Virginia. Venue here also is warranted by Defendant Mountain America, LLC keeping and maintaining vast amounts of financial information, including commercial loans, commercial loan accounts, and other loans regarding Mountain America, LLC's operating equipment at United Bank located at 500 Virginia Street East, Charleston, West Virginia, where the Mountain America, LLC real estate closings have loans with a total indebtedness, secured, properly approaches $12,000,000.00.

-4-

## THE WALNUT SPRINGS PROJECT

24.     Since August 3, 2004, the relationship between Mr. Berg and Mr. Halperin, and their rights *vis a vis* each other on the Walnut Springs project, has been governed by contract.

25.     To get the project up and running, Mr. Halperin put up approximately $400,000.00 in cash, and, along with Mr. Berg, who put up $90,000.00, initially secured financing for the development by taking out a second mortgage on his home. This second mortgage was part of the $400,000.00 contributed by Mr. Halperin.

26.     By the end of September, 2005, approximately sixty (60) customers had purchased or agreed to purchase Mountain America property.

27.     By the end of September, 2005, project expenditures over the course of the project had totaled approximately $9 Million.

28.     An Economic Impact Study for the Walnut Springs project, analyzing the projected work of Mr. Berg, showed that the project could benefit Monroe County to the tune of up to $6 Million per year, and up to a total of $65 Million benefit over a fifteen (15) year period.

29.     The Walnut Springs project is comprised of seven (7 ) different LLCs.  The first and controlling LLC is Mountain America, a company that holds six hundred forty (640) acres. All of the other LLCs are LLCs in which Mountain America is the controlling majority owner. Neither Mr. Berg nor Mr. Halperin has any interest in any other LLC other than the interests they hold jointly as members of Mountain America, and their membership in Mountain America is split evenly at 50-50.  The operating terms and duties of the other LLCs are essentially the same as the operating terms and duties in the Mountain America agreement.

## THE CHRONOLOGY OF JONATHAN HALPERIN'S WRONGFUL SCHEME TO DEFRAUD AND SQUEEZE OUT PLAINTIFF

30.     The early stage of the project development went well, and the parties had a generally amiable relationship.  For example, on April 13, 2005, Defendant sent Plaintiff an email with the subject line of "$$$$$$".  Defendant commended Plaintiff for the tremendous job Plaintiff was doing on the project. Defendant also acknowledged that only because of Plaintiff's hard work and tremendous job of selling property was Defendant able to continue to maintain his "lifestyle."  Defendant acknowledged he had only a few months of "$$$ on hand," and thanked Plaintiff for the job Plaintiff was doing selling property. Ex. 5.

31.     Beginning in August of 2005, Mr. Berg and Mr. Halperin attempted to negotiate an updated and revised Operating Agreement.  Significant differences became apparent early in that negotiation process, differences that continue today.

32.    Mr. Halperin and others have, since at least July, August-September 2005, conspired civilly to explore ways they can work together to diminish and/or completely eliminate Dan Berg's role in the company as its originator, developer, founder and Chief of Operations on the Walnut Springs project.

33.    In order to accomplish a successful take-over of the company and reap more profits for himself, it is necessary for Defendant to eliminate an obstacle – Plaintiff Daniel Berg.

34.    Pursuant to the Mountain America, LLC operating agreement, Defendant Halperin was to hold the title of CEO, and make financial decisions for the project, but to hold that title and that power only until certain "second position loans" were repaid.

35.    On approximately September 3, 2005, Mountain America paid and reimbursed to Defendant Halperin the full amount of the second position loans, and, by operation of the LLC agreement, Mr. Halperin's power as sole financial decision maker for the project and title as CEO ceased.

36.    To make the foregoing happen Plaintiff developed the Magic Five commercial & retail appraisal process for an unproven rural area. At the time of closing of the initial 640 acres, every retail and commercial appraiser would only speculate about $1,000 to $2,000 per acre in value for the project. Plaintiff knew how to create the engineering tied into the sales and tied into the commercial development phased improvement design and appraisal process. Yet, in a rural area like this, even though stunningly beautiful, the supporting institutions need proof that was not historical developed. To accomplish this Plaintiff's process was to do five sales at a first level price ($10,000 per acre average) and the five slightly higher and again until five sets of five created a formidable basis. Then to use that basis to be able to allow the exciting LLC's and the new Greentree lake LLC to be funded with commercial loans instead of investors and cash flow from closings. This made the investment safer and more profitable and able to expand into additional assets quicker without additional investors. A masterful approached devised by Plaintiff from years of experience that also provides to the purchasers the benefit of not having the extra cost of additional investors. Defendant initially was ecstatic that his investment surged exponentially, ex. 5, while he had no additional investment or risk. Later Defendant believed Plaintiff could be disregarded, even though the project is only 1 year into its contractual anticipated term of a 3 year time frame for completion.

37.    When Mountain America paid to Defendant Halperin the money for repayment of the second position loans, the Mountain America, LLC agreement transferred the LLC's financial decision making power that had belonged solely to Mr. Halperin prior to that time, to Mr. Berg. To make the foregoing occur, Plaintiff went without a salary draw (in the total amount of $60,000), whilst simultaneously investing an additional $48,000 in the project due to Defendant's personal financial issues, all at a time when the LLC's and Mr. Berg needed funds and compensations.

38.     As a result of Mountain America meeting its obligation to repay Mr. Halperin for the second
        position loans, Mr. Halperin was left with nothing more than administrative signature and
        account maintenance responsibilities, and the right to concur in Mr. Berg's financial decisions
        for the LLC, and to provide to Mountain America legal advice at the request and direction
        of Plaintiff.  Those are the only rights Defendant presently has in regard to the operation of
        Mountain America today.

39.     Despite the very clear terms of the Mountain America, LLC agreement, following Mountain
        America's payment on the second position loans, Mr. Halperin clearly was unhappy he had
        agreed to a reduced role.

40.     Defendant Halperin has, since that time and perhaps before, attempted, first through
        unsuccessful negotiations, and then through abusive litigation and publication of defamatory
        statements about Plaintiff and other oppressive conduct to take over financial control of the
        LLC from Mr. Berg, and to deny Mr. Berg his rights under the Mountain America, LLC
        agreement.

41.     Once Defendant Halperin's loans were repaid and he lost his right under the LLC agreement
        to complete control of the financial decisions of Mountain America, LLC, he began
        maneuvering more openly to seize control of the business for himself and the Mountain
        America employees/consultants who have sided with him.

42.     The plan to squeeze out Plaintiff Berg began in earnest following Mountain America's
        September 3, 2005 payment of funds to Defendant Halperin as for repayment of the second
        position loans.

43.     On September 6, 2005, Ms. Linda Shoupe, a Mountain America at will employee who is
        working under Defendant Halperin's direction and control in his effort to squeeze Mr. Berg
        out of Mountain America, emailed Halperin some details of Mountain America expenses.  In
        the email, she explains to Defendant Halperin that she would send the same expenses details
        to Plaintiff Berg under a separate cover.  She looks to Defendant for further guidance on their
        growing scheme, stating:

        "Tell me what you want me to do next, my friend.  I can't reply too much today, since he
        [Plaintiff] is plastered to his chair.  Just so you know, *I am deleting all your* [Defendant
        Halperin's] *emails to me in case he* [Plaintiff] *read my emails.*"

        (Emphasis added).  In a response email sent that same day, Defendant Halperin stated he was
        "sickened" by Plaintiff Berg, and, "I just don't even know how I will be able to occupy the
        same space as him."  Ex. 6.

44.     The next day, September 7, 2005, at 8:27 a.m., Ms. Shoupe sent Mr. Halperin an email
        emphasizing Mr. Halperin's extreme animosity toward Mr. Berg, stating, "As much as it

-7-

*sickens* you [Defendant Halperin] to converse with him [Plaintiff Berg], there is going to be a time very soon when that will be necessary." (Emphasis added).  Ex. 7.

45.   In that same email on September 7, Ms. Shoupe noted that she could see that Defendant was "firm in your decision *not to move forward with Alderson*[.]" (emphasis added).  This is significant because several weeks later, Defendant Halperin sued Plaintiff Berg in state court in Maryland, intentionally alleging falsely that Plaintiff Berg had a "duty and obligation" to proceed with a closing on that property.  In fact, this was one of several instances where Defendant, not Plaintiff, insisted that closing <u>not</u> occur.

46.   Later that day, at 2:58 p.m., Defendant Halperin sent to Ms. Shoupe and another Mountain America employee he had recruited to aid him in his squeeze out scheme, Neil Welsh, an email explaining he planned to provide to "Raj, Pete, Lucas, and anyone else I can think of" a "full disclosure" on Dan Berg.  Defendant Halperin states he will spread this information "discretely."  In the email, Mr. Halperin further goes on to detail numerous allegations about Plaintiff that he planned to reveal to "anyone I can think of" in order to damage Mr. Berg's reputation and ability to work on the Walnut Springs project.  Ex. 8.  Essentially, Defendant was referring to certain instances in Plaintiff's past that he was planning to use against Plaintiff as part of his scheme to defraud Plaintiff of the value of his membership in Mountain America.  This email is significant also because Defendant later would mislead two different state courts with representations that he had "just discovered" these incidents in Plaintiff's past as a justification for raising impertinent details of old, unrelated events in Plaintiff's past, as part of Defendant's effort to get aid for his scheme in the courts.  In fact, contrary to the misrepresentation that he had only "just discovered" these matters, Defendant has long known of them and used for false representation of "just discovered" to put these matters before the court.

47.   In response, Ms. Shoupe emailed Jonathan Halperin at 3:19 p.m. to attempt to convince him to stick to nonviolent methods to "outsmart" Plaintiff, and tried to dissuade him from behaving violently toward Plaintiff, telling him that while she thought he was right to plan to maliciously give a "full disclosure" of defamatory allegations to anyone Defendant Halperin could think of, she reminded Defendant Halperin he would "go to jail" if he shot Plaintiff:

"But please don't shoot him, you will go to jail and what reward will that give you?  You must use your skill, experience, and wit and connections to outsmart that asshole."

Ex. 9.

48.   Later on in the afternoon of September 7, 2005, Defendant Halperin replied to Ms. Shoupe by email at 5:29 p.m, telling her he had "rethought" his approach toward Plaintiff, and informed Ms. Shoupe that he had come up with a "new twist" on the plan to shoot Plaintiff – one he said he was "most hopeful will infuriate" Plaintiff.  Apparently, the "new twist"

-8-

Jonathan Halperin had come up with was to get someone else to "shoot Danny" to save himself from prison. Jonathan Halperin suggested to Ms. Shoupe that, "Perhaps Richard will shoot Danny and save us all the more heartache." Defendant promised Ms. Shoupe that if Richard would shoot Plaintiff, then Defendant Jonathan Halperin, a lawyer, either would "represent him for free," or he would "hire the best criminal lawyer for him that money will buy." Ex. 9.

49.   On September 12, 2005 Defendant Halperin sent and email to Ms. Shoupe admitting that a "dually signed letter" is needed to effect project money transfers. He has since sought court orders to abrogate that LLC requirement. Ex. 10.

50.   On September 18, 2005, as part of their ongoing negotiation to agree upon an updated Mountain America operating agreement and other matters, Mr. Berg emailed Mr. Halperin a list of 106 issues that needed to be addressed. Later that day Mr. Halperin responded and sent Mr. Berg a revised list of issues that omitted many of the issues important to Mr. Berg. One of the issues that was (and is still today) important to Mr. Berg, as reflected in both Mr. Berg and Mr. Halperin's emails was Mr. Halperin's sobriety and substance addiction. Ex. 11.

51.   On September 20, 2005 Defendant emailed Plaintiff a lengthy email concerning his recovery. Ex. 12. In that email, Defendant admitted that, "there are many things I have done that were wrong that I have to own up to." Regarding his substance addiction problem, Defendant stated to Plaintiff that, "I know where I was two months ago and never want to be there again." Defendant further justified his recent extreme antisocial behavior towards Plaintiff as follows:

"If I seem upset when we talk, please know that it is not because I am abusing substances; I am doing no such thing."

Defendant also admitted in the email he was upset with Plaintiff because Plaintiff had stated (consistent with the terms of the LLC agreements that prohibit Defendant from interfering with Plaintiff's power to direct project forces), that "'[Defendant] has no right to be here in a working, salary or management capacity.'" Despite the fact that the statement Defendant ascribed to Plaintiff was an accurate reflection of the parties rights and responsibilities pursuant to the LLC agreements, Defendant Halperin asserted, even though it was inaccurate, that "Danny, you came up with the term Executive Officer and we ascribed management responsibilities to that. For you to say I have 'no right' is insulting, disrespectful, disloyal and really outrageous. The only accurate position is the salary component which I am sure can be addressed as a draw.'"

Next, Defendant admitted to Plaintiff that he had breached a commitment to Plaintiff previously to "stay clean," justifying his drug use as "stumbling" and complaining that he "was not ready at that instant."

Defendant then stated to Plaintiff that, over Plaintiff's objection, Defendant was moving to West Virginia and leaving his Washington, DC personal injury law practice.   He tried to convince Plaintiff to agree to give him on site responsibility on the project, responsibility Defendant was not entitled to under the LLC agreements, arguing, "I am not stumbling any more.  So, now I am clean and moving there in 10 days and you send me your agenda which claims I shouldn't be there, have no right to be there, yada yada.  So, think about it.  I am coming, I am ready, and I am getting stronger, sharper, more focused and more sober every single day."

As for the other items in Plaintiff's list that needed to be addressed by the parties (beyond the issue of Defendant's sobriety), Defendant admitted, "Nearly all of the rest of your items are all very well thought out, substantially fair and mostly readily resolved (there are a few which we will have to work on in the next 24 plus hrs)."  Ex. 12.

The negotiations between the parties were thus intertwined with Plaintiff's serious concern that Defendant had an addiction problem and was still "using."  Defendant's reaction to Plaintiff's concern has to sue him and to defame him maliciously in an oppressive effort to oust him from their companies.

52.   On September 20, 2005 Mr. Halperin emailed Mr. Berg an attached document entitled "Issues for Incorporation into Mountain America Operating Agreement by Addendum or Otherwise".  Ex. 13.  Mr. Halperin's email attachment, at point No. 5, states as follows: Blue Mountain Entity: DB [Daniel Berg] shall operate a separate LLC for new project[.]"  Clearly, this is an admission from Defendant Halperin that he was aware of and discussing as a negotiation issue Mr. Berg's operation of a new and separate LLC.   Nevertheless, a centerpiece of his Maryland lawsuit is the misrepresentation that Plaintiff created the LLC is secret for some devious purpose.

53.   Two days later, as part of the ongoing negotiation process that Mr. Halperin clearly was participating in as reflected by his September 20 email attachment, Mr. Berg emailed Mr. Marc Miller a notification that the new LLC Mr. Halperin had referred to his September 20, 2005 email attachment was called "Intermountain Investments, LLC."  Ex. 14.

54.   However, on September 27, 2005 the parties negotiations reached an impasse.  Many points Mr. Berg wanted addressed were being ignored by Mr. Halperin, including Mr. Berg's concern for Mr. Halperin's addiction.  On that date, at 2:43 p.m., Mr. Halperin emailed Mr. Berg and stated, *inter alia*, as follows:

"If you have a proposal for review by counsel that addresses member and investor protection issues please forward it to me.  I am not going to do this verbally.  **If not, then I agree we are dead in the water on Blue Mountain** and I accept your invitation to operate Mountain America under the new agreement, with you accepting all the responsibilities of signing as necessary for budgeted items and not impeding the business."  (Emphasis added).

-10-

This was not actually an acceptance of any proposal, however, because later in the email Mr. Halperin states:

"If I hear from counsel for the corporation and my counsel, both of whom are extremely respected and able that there is a commercially reasonable means of effecting this than [*sic*] I am game.  Otherwise, I accept your invitation."

Ex. 15.

55.     At 3:13 p.m. on September 27, Mr. Berg responded to Defendant Halperin's email with the proposal Mr. Halperin had asked for.  Ex. 16.

56.     At 3:19 p.m. Mr. Halperin responded in an email, stating, *inter alia*, "This is for the lawyers to discuss re commercially reasonable protections."  Ex. 16.

57.     At 9:44 p.m. on September 27, Mr. Halperin emailed Mr. Berg and noted their were "2 outstanding issues between us: the financial control concept for mountain two and revision of section 16 for mountain one.  Assuming these issues are resolved there remains one core issue to be resolved: the percentages for mountain two.  I have reviewed your spreadsheet.  I find it difficult to understand, unnecessarily complex and impossible to explain to investors. **I have a take it or leave it counterproposal.**"  (Emphasis added).  At that point, Mr. Halperin proposed dramatically different terms from what had been the basis of the negotiations.  He then concluded his email self-servingly as follows:

"I will only close tomorrow with a firm agreement as outlined above and believe that this is a fair way to move forward and conduct business.  Please let me know your thoughts at your earliest convenience.  Jonathan."

Ex. 17.  This clearly was an attempt by Mr. Halperin to use the time pressure of making arrangements for a transaction they were trying to negotiate as a way to leverage large concessions from Mr. Berg at the last minute.  The strong arm tactic of Mr. Halperin was unsuccessful.  This email also puts the lie to Defendant's later accusation that Plaintiff had a "legal duty and obligation" to close on one subject property.   If that were so, then Defendant's threat not to close unless Plaintiff agreed to Defendant's terms would constitute undue influence.

58.     At 10:35 p.m. on September 27, 2005, Mr. Berg conveyed his disbelief and shock at Mr. Halperin's last minute pressure tactics, and responded to the effect that he still had concern about Mr. Halperin and his addiction.  Mr. Berg addressed his concern for Mr. Halperin by stating, *inter alia*, as follows:

"I am sorry that this has not turned out the way you ultimately would have like[d] it, but your recovery really should be your focus now.

-11-

Until there is a working agreement your presence is an interference of my working forces. Please do not interfere with the company, in your current condition your presence is not a benefit.

I will continue, as I have for the last year and a half, to honor my duties to protect and move forward the project and the investment.

Dan"

Ex. 18.

Mr. Berg was well within his contractual rights to demand that Mr. Halperin not interfere with Mr. Berg's direction of project forces, as the LLC agreements between them specifically prohibit Defendant halperin from interfering with Plaintiff's direction of project forces.

59.     At 10:50 p.m. Mr. Halperin responded with mock indignation to Mr. Berg's email, stating, *inter alia*, as follows:

"I will gladly take you up on your offer to leave and I would be pleased to run the business as we have previously discussed."

The foregoing clearly was said facetiously, for in the next few lines Defendant Halperin made yet another effort to pressure Mr. Berg into agreeing to his last minute oppressive terms, first accusing him falsely of fiscal impropriety, and then threatening to sue him in the State of Maryland:

"Absent resolution action will promptly be initiated in Maryland to protect the corporation and the investors in the related LLCs." Ex. 19.

60.     Thereafter, by the next morning (September 28, 2005), having been unsuccessful in his efforts to strong arm oppressive concessions from Mr. Berg either through the pressure of time constraints or misrepresentations of fiscal improprieties or the threat of a Maryland lawsuit, Mr. Halperin stated he was "not prepared to go forward with either the Mountain America or Blue Mountain agreements based on the current drafts[.]" Ex. 20.  He went on to declare his position as follows: "in light of recent developments, the general approach of both drafts needs to be rethought and recast."   Again, these statements are in stark contrast to the intentional false allegation Defendant Halperin made in his Maryland lawsuit that Plaintiff had a "duty and obligation" to proceed with a closing on that same property that Jonathan Halperin stated he was "not prepared to go forward" with because the draft agreements thereon needed to be rethought and recast. *Id.*

61.     The next day (September 29, 2005), in an obvious and wholly transparent attempt to "set-up" the impending Maryland lawsuit, Mr. Halperin crafted the first of several self-serving emails

that appear to have been designed solely to be included as attachments to that Maryland lawsuit. Ex. 21. These series of emails were attached to the Maryland Complaint. Those emails of Mr. Halperin are inaccurate in every material way, and are woefully incomplete in their portrayal of the events they purport to memorialize. In particular, despite the fact Mr. Halperin had only the day before stated he was <u>not</u> prepared to go forward and wanted the draft agreements "recast", he now attempted to change history and baselessly accused Mr. Berg of making demands that jeopardized the LLCs' ability to take advantage of a corporate opportunity, when, in fact, Mr. Halperin was the party substantially changing the negotiating terms. Defendant was engaged in an effort to pressure Mr. Berg to concede on substantial issues that, prior to that time, the parties agreed upon.

62.     On September 30, 2005, Mr. Berg responded to Mr. Halperin's heavy-handed threats and misrepresentations with a genuinely good faith attempt to lay all the business issues between the parties on the table. Ex. 22.

63.     In response to the September 30, 2005 email of Mr. Berg, Mr. Halperin sent several more self-serving emails to Mr. Berg, that, in retrospect, were designed for attachment to the Maryland lawsuit he was preparing. Ex. 23. Needless to say, Mr. Halperin's self-serving emails did not result in an agreement amongst the parties.

64.     Also during the month of September, 2005 and thereafter, Plaintiff Berg repeatedly requested that Defendant honor his fiduciary responsibility and obligation concerning the HUD 99 allocation and interstate advertising rules as they relate to sales contracts. Mr. Berg initiated discussions with Defendant Halperin and Robert Chamberland to include company counsel and a HUD expert was queried as well. The result of the discussion and queries was the discovery that to expand as Defendant desired would create a problem that precluded proceeding without some sort of advisory opinion. Defendant disregarded Plaintiff's concerns in that regard.

65.     Despite the lack of agreement, Mr. Halperin on October 2, 2005 attempted to act unilaterally to commit Mountain America to a deal that Mr. Berg did not consent to. Ex. 24. Defendant's conduct was oppressive and wrongful and breached the terms of the LLC and wholly exceeded his authority.

66.     On October 3, 2005 Mr. Halperin tried again to use threats to pressure Mr. Berg to agree to commit Mountain America to a deal of which Mr. Berg continued to have strong reservations and to which the terms of those agreements Mr. Halperin himself previously had only days before argued were in need of being recast. In yet again in another email, Mr. Halperin threatened Mr. Berg as follows:

"I have been sent the closing documents by United Bank and Bill Goodwin and they are now executed by Mountain America's CEO. A copy is being PDF sent to all, and the originals shall be sent by FedEx today, 1st am delivery. Your signature is awaited in Mr. Goodwin's

-13-

office today. . . . Please understand that I intend to hold you personally responsible for any and all damages and losses Mountain America suffers as a result of your failure to close[.]"

Ex. 25.  Despite the fact the parties' negotiations on agreements that would be acceptable to both of them had been unsuccessful, Defendant wrongly insisted Mr. Berg had some sort of contractual and fiduciary duty to comply with Mr. Halperin's oppressive demands.  This, too, appears to be part of a "set-up" by Mr. Halperin to create from whole cloth a justification for the lawsuit he was preparing to file against Mr. Berg in Maryland the next day.

67.   Although Mr. Berg and Mr. Halperin exchanged a number of emails on October 4, 2005, they were unable to come to any agreements.  Consistent with his efforts to gain leverage over Mr. Berg through threats, oppression and undue coercion, while these emails were being exchanged, Mr. Halperin was causing the Maryland lawsuit to be filed against Mr. Berg.

68.   Despite the regular email traffic between Mr. Halperin and Mr. Berg, and despite the fact that Mr. Halperin, a lawyer, knew Mr. Berg was represented by counsel, Mr. Halperin came to a state court in the Southern District of West Virginia on October 6, 2005, and demanded an *ex parte* hearing, giving no notice to Plaintiff or his counsel, and made no effort to inform that court that he had been in regular contact with Mr. Berg, knew his cell phone number, and that Plaintiff was represented by counsel.  Under those circumstances, and considering that those circumstances were concealed from the state court by Defendant, it is abundantly clear that an *ex parte* hearing should not have been conducted, but this information was concealed by Mr. Halperin from the state court so that he could use uncontradicted misrepresentations to get an order from the Court that he could use in his wrongful effort to gain leverage over Mr. Berg.

69.   Despite knowing how to reach both Mr. Berg and his counsel, Defendant Halperin went to the state circuit court *ex parte*, and used the filing of a lawsuit they had filed two days before in Maryland, the timing of which he obviously had complete control, to convince that court to enter an order *ex parte* that allowed him to keep Mr. Berg from exercising his rights under the Mountain America, LLC contract.

70.   Incredibly, Defendant Halperin did not offer to the state court the Mountain America LLC agreement, nor did he reveal the fact that the relief he was requesting and obtained was expressly for the purpose of allowing Jonathan Halperin to take over operations control of the project that, by contract, he had no authority to control.

71.   Even more incredibly, however, after representing to the state court that he needed to have an *ex parte* court order to exclude Mr. Berg from the Mountain America project based upon his contrived allegation of a fear of violence, Mr. Halperin took the state court's Temporary Restraining Order, drafted by him, and immediately issued a press release, along with the *ex parte* Temporary Restraining Order, both to the media and to Walnut Springs project vendors.  Exs. 4, 28, 29, 30.

-14-

72. In that Press Release Jonathan Halperin admitted his true goal, which was not to stop some alleged perceived violence, but rather to use the process of the state court to help him achieve what he could not achieve through negotiation or the use of the threats of litigation, that is, to wrest control of the LLC and deprive Mr. Berg of the operational control Plaintiff has the right to exercise pursuant to the LLC contract.  Ex. 4.

73. In his Press Release, attached hereto as Ex. 4, Jonathan Halperin took full advantage of the *ex parte* TRO to convey the false impression that Mr. Berg was "no longer associated with our company." *Id.* October 8, 2005 Press Release.

74. Most revealingly, Mr. Halperin admitted his true purpose in instigating the *ex parte* TRO proceeding was to "eliminate Daniel Berg as a representative of our company," stating:

> "'[W]e have taken certain legal steps that are in the best interests of both the community and our company.  **These steps include seeking an order from Monroe County Circuit Court that will eventually eliminate Daniel Berg as a representative of our company in this community.**'"

*Id.* (Emphasis added).  Contrary to the press release, Defendant never mentioned to the Monroe County Circuit Court that he was filing this TRO to eliminate Plaintiff as a representative of the LLC.  Defendant also slandered Plaintiff to many citizens of the local community by falsely stating that Plaintiff's conduct made him liable for a five year prison sentence.

75. The blatantly disloyal conduct by Mr. Halperin, publicly disparaging Mr. Berg and admitting that the *ex parte* TRO was sought from the state court as part of his scheme to squeeze out Plaintiff from the LLCs, is inconsistent with his fiduciary duty to Mr. Berg as an equal member of their LLCs, and clearly violated the duty of good faith and fair dealing inherent in every contract.

76. As a Washington, D.C. trial lawyer with no business experience, and being unable to negotiate concessions from Mr. Berg in arms length contractual discussions, Mr. Halperin and his cohorts, Mr. Chamberland and Ms. Shoupe, turned instead to litigation in a brazen attempt to seize operational control of the Walnut Springs project from Plaintiff Berg.

77. A trial lawyer himself, Mr. Halperin likely is far more comfortable using the litigation process to get what he wants than properly engaging in arms length business contract negotiations, in an area in which he has far less experience or leverage.  In its essence, then, that is what the state court proceeding was really about: wrongfully using the process of the court to get leverage over Plaintiff to seize operational powers and rights in the LLCs that, by contractual agreement, belong to Plaintiff.  It should go without saying that the use of court time and authority for such a devious and wrongful purpose should not be countenanced.

-15-

78.     On October 10, 2005, Defendant Jonathan Halperin and Linda Shoupe discussed whether Defendant Halperin had time to pick up a laptop computer for new Mountain America intern employee Vinu Kumar.   Defendant Halperin acknowledged Mr. Kumar's need for a computer, suggesting Ms. Shoupe order Mr. Kumar a computer from either Dell or HP and have the computer shipped to Mountain America by Federal Express.   This discussion is especially significant considering on November 3, 2005, Defendant Halperin, by counsel, claimed he had not consented to Mr. Kumar being hired by Mountain America.   Not only is Defendant Halperin's agent's representation untrue, pursuant to the Mountain America, LLC agreement, Defendant Halperin does not have any authority whatsoever to approve or reject project employment decisions.

79.     Mr. Halperin used the fruits of his *ex parte* TRO motion to exclude Mr. Berg from Mountain America, LLC offices and property.   During that period of exclusion, Mr. Halperin used the state court's TRO to direct the use of funds held in Mr. Berg and Mr. Halperin's 1031 exchange accounts, and also to attempt to direct all financial aspects of the company.  Ex. 31.

80.     On October 11, 2005, Ms. Shoupe, who was acting at the direction of Defendant Halperin, emailed the *Washington Post* in an effort to disparage Plaintiff and his ability to conduct business.   She made the following statement: "Attached please find the TRO (temporary restraining order) that clearly states Dan Berg has no authority to make any decisions for Mountain America, LLC t/a Walnut Springs Mountain Reserve.  Jonathan Halperin is paying all the bills, Mr. Halperin is making all decisions.  He has instructed me to communicate to you to please proceed with the ad that Neil has discussed with you today." Ex. 28.  The ad Defendant Halperin was directing to be placed was one that Plaintiff specifically had directed *not* be placed.  The placement of such ads was solely within the power and authority of Plaintiff pursuant to the Mountain America, LLC agreement, paragraphs 30 and 31. Defendant Halperin's interfering direction was a direct breach of the company agreement.

81.     During this initial TRO period, Defendant directed others to purchase for him "shock killer bullets" for a Mountain America owned snake gun.  Plaintiff is presently in fear of Defendant because of Defendant's hateful conduct towards him and because, upon information and belief, Defendant also owns and carries a concealed handgun.

82.     On October 11, 2005 also, Defendant Halperin sent or faxed to Jim Harrison at Branch Highways, Inc. in Roanoke, Virginia, a letter on Walnut Springs project stationary.  Ex. 30. Mr. Halperin stated in his letter as follows:

"Attached please find the Temporary Restraining Order signed by Judge Irons in Monroe County, West Virginia.  As I am Chief Operating Officer of Mountain America, LLC and as Daniel Berg no longer has neither check-writing authority nor any authority to be within one-half mile of the property.  He should not be in contact with our vendors.  Mr. Berg does not now possess the authority to interfere with your fine work.  Please direct any and all questions you might have about our project promptly to me at [xxx-xxx-xxxx] or our attorney, Joanna

-16-

Tabit, Esquire, of Steptoe-Johnson in Charleston. She can be reached at [xxx-xxx-xxxx] and would welcome your inquiries."

83.   On October 12, 2005 Defendant sent a letter to Mr. Craig Holcomb at Holcomb, Straile & Toone in Rockville, Maryland. Ex. 31. Attached to the letter were four "authorizations" signed by Defendant. In each of the four documents Jonathan Halperin signed he represented that he was "authorized manager of Mountain America, LLC, [and] by this instrument terminate [or revoke] the Exchange Agreement, and demand the immediate release of the remaining proceeds[.] I Jonathan Halperin acknowledge that by withdrawing the remaining proceeds of the transaction . . . that the members of Mountain America, LLC are subject to capital gains on this amount." However, contrary to his representations to Mr. Holcomb, Defendant Halperin had no authority to act to terminate those 1031 accounts unilaterally and cause Plaintiff to lose the benefits and protections of those accounts, nor did Defendant Halperin have the right to unilaterally direct that the money be used to on Mountain America expenses.

84.   On October 13, 2005, Defendant Halperin directed Mr. William Goodwin, an escrow agent, to make certain expenditures of over $350,000 from accounts that required the signature authorization of Plaintiff. Ex. 33. Defendant's unilateral directions breached the Mountain America agreement.

85.   On October 14, 2005 a hearing was held in the state court on the *ex parte* TRO. The Court modified the previous order, essentially dissolving the conditions imposed *ex parte* and allowed the Plaintiff to return to, and thus perform his duties at Walnut Springs. Apparently not agreeing with Jonathan Halperin's contrived rationale for the filing of the motion, the state court did not impose any distance restrictions on the parties, but did direct that they act civilly and not threaten each other. Importantly, the state court imposed this restriction not just on Plaintiff, but on Defendant Halperin and his cohorts as well.

86.   On October 25, 2005, after the terms directed by the state court in its October 14 hearing expired, Defendant Halperin filed in the Circuit Court of Monroe County a Motion for Contempt against Plaintiff. *Inter alia*, the Motion for Contempt sought TRO relief allowing Mr. Halperin to:

**"to singularly close land sales on behalf of the company using William Goodwin as the closing attorney"**.

(Emphasis added). The purpose of the Motion was transparently obvious – to deprive Plaintiff of his rights and powers under the Mountain America, LLC. Defendant Halperin's request was directly contrary to the Mountain America, LLC agreement, whereby Mr. Berg must agree to all sales in writing, and is responsible for all closing coordination (Mountain America, LLC agreement at ¶ 30); therefore, the requested relief was nothing more than a

-17-

wrongful power play by Mr. Halperin in an effort to divest Mr. Berg of his contractual rights, and to invest Mr. Berg's rights instead in favor of Defendant Jonathan Halperin.

87. Defendant Jonathan Halperin also requested in his Motion for Contempt that the state court direct that proceeds from any Mountain America, LLC sales be subject to Defendant Halperin's direction and control, all in contravention of the LLC agreement, and that proceeds be deposited in Mr. William Goodwin's trust account, "to be expended only for authorized company expenses" This relief requested by Mr. Halperin attempted to change the terms of the Mountain America, LLC agreement that has in place controls and protections for both parties so that one member, like Jonathan Halperin, may not take over the business. The requested TRO relief also begged the question of what would constitute an "authorized company expense" and who would make that decision. This extraordinary request was the true focus of the Motion for Contempt, as it then could be used to enable and justify Defendant's Halperin's attempt to take over authority under the LLC agreement that belong to Mr. Berg, and thus to fully seize control of the business and eliminate Mr. Berg, the true goal of Defendant Jonathan Halperin as admitted in his October 8, 2005 press release. Ex. 4.

88. Per the specific terms of the Mountain America, LLC, operating agreement, Mr. Berg, who has been working at a breakneck pace for months, working 14 to 16 hour days for six or seven days a week, is entitled to begin a vacation break in November, and Defendant's actions are circumventing his upcoming time off.

89. Until the parties can agree on some other arrangement, Mr. Berg desires and has the right to hold Mr. Halperin to the financial and operational terms of the LLC operating agreement that is in operation unless or until both parties agree on different terms.

90. Mr. Berg wants to fulfill his responsibilities under the operating agreement, and he absolutely agrees Mr. Halperin may receive his portion of profit according to the terms of that agreement. However, Mr. Halperin, by his actions, has been forum shopping in an effort to direct significant changes to the terms of the Mountain America, LLC, operating agreement, to diminish or eliminate Mr. Berg's role and rights, and to expand greatly Mr. Halperin's control of the company.

91. Defendant appears to believe he already has extracted from Mr. Berg enough substantial contributions to the Walnut Springs project through his exhausting work and effort to date. Because of Mr. Berg's extraordinary efforts, the project has been launched successfully, with sales of over $12 million in real estate, and the initial investors have been repaid. Mr. Halperin, with the help of Mr. Chamberland and Ms. Shoupe, appears to hope to use the ex parte process to consolidate his power over the Mountain America, LLC and the Walnut Springs project, and to eliminate Mr. Berg (the admitted goal of this lawsuit as stated in Mr. Halperin's October 8, 2005 press release) – even though Mr. Berg is one person amongst them with experience as a real estate developer -- and even though it was Mr. Berg who created and is responsible for implementing the Mountain America master plan.

-18-

92.    Mr. Berg has been attempting to operate the company and direct forces as he is authorized to do under the LLC agreements.

93.    During the period the *ex parte* TRO was in effect (October 6 through October 14, 2005), the Defendant changed the locks on Mountain America, LLC property, and at the time the *ex parte* Order terms were modified and replaced on October 14, 2005, Mr. Berg had no key or access to Mountain America, LLC property.

94.    On Friday, October 14, 2005 when the court ordered the *ex parte* TRO terms lifted and replaced by different terms, Mr. Berg and his mother went to the Union office of Mountain America, LLC to meet with the new international intern (Mr. Kumar). Property owners in Walnut Springs, Mr. and Mrs. Bober, also witnessed, along with Mr. Kumar, Mr. Berg and Mrs. Schonberger – that Mr. Berg requested, in a pleasant, civil manner, that everyone at the office attend a meeting so that keys could be distributed to Mr. Berg and coordination could occur to pay bills and other necessary LLC business. Mr. Chamberland uncivilly brushed Mr. Berg to the side as he, Ms. Shoupe, Neil Welsh and Mr. Halperin all ran out, with Mr. Chamberland stating "we've already paid the bills, we are not going to meet with you." The door was slammed as they left and jumped in their cars and sped off.

95.    Over the weekend of October 14th, Mr. Berg spoke to Neil Welsh about Mountain America, LLC business and Mr. Welsh said he would be at the Union office – Mr. Berg was led to believe Mr. Berg would have access and ability to distribute keys that way. Upon information and belief, Mr. Welsh never showed up the entire weekend.

96.    Therefore, to get access to the office and exercising his contractual rights, Mr. Berg put new locks on the back door and the front dead bolt, but left the existing lower front door lock in place.

97.    Mr. Berg has not denied Mr. Halperin access to Mountain America, LLC property, as Defendant has alleged falsely in state court in both West Virginia and Maryland. Mr. Berg intended Mr. Halperin would have access and offered him access, yet Defendant refused this offer in order to justify his later false representations to state courts.

98.    After the terms of the *ex parte* TRO were modified after the October 14 hearing, Mr. Berg discovered the rest of the Mountain America, LLC staff, with the exception of Mr. Miller and Mr. Kumar, had, at Defendant's direction, conspired to defame Mr. Berg through the October 8 press release, and used company computers to distribute the defaming press release, the *ex parte* TRO, and, upon information and belief, other information that portrayed Plaintiff in a false light.

99.   Mr. Berg further discovered after October 14 that Defendant directed forces and may have breached Mountain America, LLC contracts that Mr. Berg, as Mountain America, LLC COO already had in effect.

100.  Plaintiff also was concerned Defendant and those under his control had removed company documents.

101.  Plaintiff discovered Defendant personally or in direction to others, had opened his personal mail and distributed and/or published the contents thereof to others, in violation of 18 U.S.C. § 1702, as well as attempted to destroy personal property of Mr. Berg, including all of his business cards.

102.  Therefore, to enforce and in the legitimate exercise of his rights under paragraphs 30 and 31 of the Mountain America, LLC, agreement, Plaintiff moved essential operations from the Union office to the Mountain America, LLC owned corporate residence.   Defendant thereafter disputed Plaintiff's contractual right to effect the foregoing.

103.  Mr. Robert Chamberland was not an employee of Mountain America, LLC, but rather Mr. Chamberland was a 'consultant' employed by a third party independent contractor called Artha, LLC.

104.  Mountain America, LLC paid Artha, LLC for consulting services on an at will basis.

105.  Artha, LLC is not a party or member of either Mountain America, LLC or Greentree, LLC.

106.  Plaintiff terminated Artha/Chamberland because Mr. Chamberland disrespectfully refused to comply with Mr. Berg's directions in regard to Mountain America, LLC project business.

107.  Plaintiff had the right to terminate Mr. Chamberland pursuant to the Mountain America agreement.

108.  In other words, Mr. Chamberland, as part of an effort directed by Defendant to create a situation Defendant could use to accuse Mr. Berg of being in contempt in the West Virginia state court, sought to "bait" or "provoke" Mr. Berg into taking some action Defendants then could use to come to this Court and accuse Mr. Berg of being unfaithful to the Court's October 14 order.

109.  Mr. Berg took action pursuant to his authority under paragraphs 30 and 31 of the Mountain America, LLC operating agreement contract.  Pursuant thereto, Mr. Berg is entitled to direct all project forces without any interference by another member, and to have a staff under his control.  Plaintiff was just trying to get Mountain America, LLC and other LLC business done without interference by Mr. Chamberland.  The discharge of Artha, LLC/Chamberland was

done solely to ensure and enable Mr. Berg to carry out his contractual rights and responsibilities. Defendant disputes Plaintiff's contractual rights in this regard.

110. Defendant did in fact move the West Virginia state court to hold Plaintiff in contempt for terminating Mr. Chamberland. The state court ruled that Plaintiff was not in contempt for so doing.

111. Mr. Chamberland, acting at the direction or in concert with Defendant as part of the civil conspiracy, recorded (hiding first, and then revealing he was recording) the entire exchange that led to his discharge. Among Mr. Berg's first work related requests to Mr. Chamberland the day of the discharge was to take notes of items that needed to be addressed for that day's work. At the direction of and in concert with Defendant, in an effort to bait Mr. Berg into violating the TRO, Mr. Chamberland refused to comply with any request of Mr. Berg, making statements to the effect that he did not have listen or comply with anything Mr. Berg said. Mr. Berg civilly asked Mr. Chamberland to comply with his work requests several more times. Mr. Chamberland replied again he did not have to listen to Berg. Solely to carry out Mountain America, LLC's business affairs, Mr. Berg then told Mr. Chamberland that unless Mr. Chamberland stopped being insubordinate and agreed to do his job, he no longer worked for Mr. Berg and Mountain America, LLC. After Mr. Chamberland unsuccessfully attempted to bait Mr. Berg into acting uncivilly, Mr. Chamberland, acting at the direction and in concert with Defendant, nevertheless continued to harass Mr. Berg by putting a recorder directly into Mr. Berg's face, and stepping in front of Mr. Berg anywhere he tried to walk.

112. When Mr. Berg and Mountain America, LLC employee Richard Miller attempted to carry out business on the Walnut Springs project by communicating with a representative of contractor Branch Highway, as per Mr. Berg's authority and responsibility under paragraphs 30 and 31 of the Mountain America, LLC agreement and paragraphs 25, 26 and 32 of the Greentree, LLC agreement, Mr. Chamberland, acting at the direction and in concert with Defendant, several times interrupted Mr. Berg and tried to give conflicting information/direction to the contractor. Because he was acting at the direction of Defendant, this was a breach of the Mountain America agreement by Defendant.

113. Mr. Berg discussed with the representative of the contractor and Mr. Miller the progress made on work on the Greentree property, and, pursuant to his rights and responsibilities under paragraphs 30 and 31 of the Mountain America, LLC agreement and paragraphs 25, 26 and 32 of the Greentree, LLC agreement, instructed them to close down all improvements except for sediment control. Mr. Berg explained discussed the reason for this was that approved funding for Greentree, LLC did not get in place as a direct result of Defendants suing him, and therefore Greentree could not pay for further work. Mr. Chamberland, acting at the direction of Defendant, contradicted Mr. Berg, and stated incorrectly that Greentree, LLC did have funding. Mr. Berg then asked Mr. Chamberland to reveal the source of the alleged funding in light of the contractual LLC terms that required Mr. Berg's approval of all funding sources. Mr. Chamberland, acting at the direction of and in concert with Defendant,

-21-

replied that he did not have to reveal any such information to Mr. Berg. This was a breach of duty by Defendant.

114. Mr. Berg, exercising his contractual authority under paragraphs 30 and 31 of the Mountain America, LLC agreement and paragraphs 25, 26 and 32 of the Greentree, LLC agreement, thereafter civilly requested Mr. Chamberland return his Mountain America, LLC keys, and to return the key to the Range Rover that by paragraph 41 of the Mountain America, LLC agreement belong to Mr. Berg. Mr. Chamberland, acting at the direction and in concert with Defendant, refused. This was a breach of duty by Defendant.

115. Exercising his contractual authority under paragraphs 30 and 31 of the Mountain America, LLC agreement and paragraphs 25, 26 and 32 of the Greentree, LLC agreement, Mr. Berg civilly also requested Mr. Chamberland to leave Mountain America, LLC property, so that Mr. Berg could get back to work on the Walnut Springs project without interference by Mr. Chamberland. In a further effort to "bait" Mr. Berg into violating the Court's direction, Mr. Chamberland, acting at the direction of and in concert with Defendant, refused this request. This was a breach of duty by Defendant.

116. In order to conduct Walnut Springs project business, as is his right and responsibility under the LLC agreements to do so without interference by Mr. Chamberland, Mr. Berg was forced by Mr. Chamberland's uncivil conduct, conduct that was at the direction and in concert with the Defendant, to ask Mr. Miller and other staff to get in Mr. Miller's vehicle so that they could finish their business discussions without being interfered with or harassed by Mr. Chamberland.

117. Acting at the direction of and in concert with Defendant, Mr. Chamberland followed up his disruptive conduct by going to the Mountain America, LLC owned office and childishly refusing to leave. Later that day, Mr. Berg inquired of Mr. Chamberland the location of certain documents that previously had been in the office. Mr. Chamberland, acting at the direction of and in concert with Defendant, refused to produce or reveal the location of the requested documents, and later that day Mr. Berg located the file jacket, but the document he inquired to Mr. Chamberland about was missing.

118. Throughout September and October of 2005, Ms. Linda Shoupe exceeded her employment authority as an employee of Mountain America, LLC. For example, Ms. Shoupe disregarded Mr. Berg's direction and, acting at the direction of Defendant, hired an advertising agency for the project different from the one directed by Mr. Berg, even though the choice of an advertising firm is one within Mr. Berg's contractual authority. Ms. Shoupe also conspired with Defendant to publish on October 8, 2005 the "Press Release" disparaging Mr. Berg and confirming the intent of the proceeding filed in this Court is to oust Mr. Berg from his membership in Mountain America, LLC and the Walnut Springs project. These were breaches of duty by Defendant.

-22-

119.   Ms. Shoupe did not report for work immediately after the hearing held on October 14. Upon information and belief, she failed to appear for work at the direction of and in concert with Defendant's scheme.

120.   Plaintiff discovered after the October 14 state court hearing that Ms. Shoupe, at the direction of an in concert with Defendant, had disparaged Mr. Berg in emails to vendors and service suppliers, and told them not to communicate with Mr. Berg, actions clearly in contravention of Mr. Berg's rights under the Mountain America, LLC agreements.   At Defendant's direction, Ms. Shoupe widely distributed the October 8 'press release', and the local Monroe Watchman article recited verbatim much of the state court's *ex parte* TRO order, drafted by Defendant or his agent. This was another breach of duty by Defendant.

121.   Acting under the direction and control of Defendant, Ms. Shoupe has been disloyal and has refused to take direction from Plaintiff in her administrative position.

122.   For over five days following October 14th, Ms. Shoupe, acting at the direction and control of defendant, did not respond to Plaintiff's emails requesting passwords, keys and documents. This was a breach of duty by Defendant.

123.   Exercising his authority under the Mountain America, LLC operating agreement, paragraphs 30 and 31, Plaintiff placed Ms. Shoupe on suspension.   Defendant disputes Plaintiffs' authority under the contract in this regard.

124.   Mr. Berg repeatedly had requested that Ms. Shoupe provide to Mr. Berg invoices or documentation that reflected Mr. Halperin's personal American Express credit card charges that were reimbursed by Mountain America, LLC.   Upon information and belief, those personal credit card charges reimbursed by the LLC were in the tens of thousands of dollars. Ms. Shoupe, an at will Mountain America employee subject (pursuant to paragraphs 30 and 31 of the Mountain America, LLC agreement) to Mr. Berg's direction on Mountain America matters, refused, at the direction and control of Defendant, to comply with every such request by Mr. Berg.   This was a breach of duty by Defendant.

125.   Ms. Shoupe also refused Mr. Berg's direction (made pursuant to authority of the LLC agreement, ¶¶ 30-31) that she keep a journal of her activities conducted for Mountain America, LLC.

126.   Despite Mr. Berg's right to control project forces and direction and other on site matters pursuant to paragraphs 30 and 31 of the Mountain America, LLC agreement, Ms. Shoupe did not report to Mr. Berg, but instead would report to Defendant Halperin, and, at Defendant's direction, often would only partially share important Mountain America, LLC information with Mr. Berg.

-23-

127.   From the beginning of the Walnut Springs project, Mr. Berg has conducted the business of Mountain America, LLC as its COO, and has informed company employees, contractors, and consultants that he is in control of forces, per the Mountain America, LLC agreement.  In order to carry out his rights and responsibilities pursuant to the LLC agreements, Mr. Berg has instructed those persons and entities that all information and direction on the Walnut Springs project should come through Mr. Berg.  Defendant disputes the foregoing contractual rights of Plaintiff.

128.   Mr. Berg regularly instructed (pursuant to his rights under paragraphs 30 and 31 of the Mountain America, LLC agreement) those with whom he has communicated on behalf of Mountain America, LLC project business, that they should and could rely on his instructions and direction of project forces.  Defendant disputes those contractual rights.

129.   Following the October 14 hearing, when Mr. Berg was permitted to return to the Walnut Springs project, Mr. Berg was forced to reiterate his authority and responsibilities to control and direct project forces without interference as stated in the LLC agreements.  Because of misrepresentations as to his membership status and contractual rights made by Defendant Halperin and those acting at his direction, Mr. Berg was forced to let project employees, consultants and vendors know they should cease taking operational direction from Mr. Chamberland, Ms. Shoupe, and Defendant Halperin, as such direction was outside the scope of their responsibilities under the LLC agreements and, in the case of Ms. Shoupe and Mr. Chamberland, their employment status.

130.   Following October 14, Mr. Berg asked escrow agent William Goodwin to coordinate all closings through Mr. Berg, per Mr. Berg's rights and responsibilities under the Mountain America, LLC agreement.  Mr. Berg's intent in so doing was to reconfirm his responsibilities and the responsibilities of others that had, upon information and belief, been contradicted and misrepresented in the community by Defendant Halperin, Ms. Shoupe and Mr. Chamberland.

131.   Defendant Halperin has hired as an agent a public relations consultant named Ron Gregory, to spread misrepresentations concerning Mr. Berg to local and regional media.

132.   Mountain America, LLC owns a Mercedes SUV vehicle.   The use of the vehicle is subject to Mr. Berg's control of project forces on the project pursuant to paragraphs 30 and 31 of the Mountain America, LLC contract.  Defendant disputes that contractual right of Plaintiff.

133.   Plaintiff has requested that Defendant perform his contractual responsibility and distribute funds to pay Plaintiff's Mountain America salary draw.  Defendant has for two months refused to do so in breach of his fiduciary duty to Plaintiff.

134.   Mr. Berg has conducted Mountain America, LLC project business from a company owned residence in Lewisburg since the residence was acquired by Mountain America, LLC.

-24-

135. Both Mr. Halperin and Mr. Berg have had corporate papers and computers utilized at that residence.

136. Pursuant to his power and responsibility to control project forces pursuant to paragraphs 30 and 31 of the Mountain America, LLC contract, Mr. Berg made the decision following October 14, 2005, to more fully utilize the corporate residence for the purpose of avoiding unnecessary conflicts with Defendant, those directly under his control, especially Mr. Chamberland, who, acting at the direction and in concert with Defendant's scheme, had displayed combative and disagreeable behavior. Defendant disputes Plaintiff's contractual authority in that regard.

137. Defendant, by his acts and omissions, is causing Mountain America irreparable harm. Defendant has interfered to such an extent with Mr. Berg's direction of project forces, that Mr. Berg's attempts to undue the harm caused by Defendant and to come up with a way to logistically move forward with Walnut Springs project business are damaged.

138. Contractor Branch Highways performed work at the Greentree property, and did other work as well. On October 11, upon information and belief, Defendant Halperin unilaterally contacted Branch and transmitted to Branch the state court's *ex parte* TRO Order, and misrepresented that by virtue of the TRO, Mr. Halperin was in charge and that Mr. Berg no longer had authority to participate in LLC decisions. This was a breach of duty owed to Plaintiff.

139. On October 17, Branch requested clarification of Defendant Halperin's communication to them, and asked for written clarification of any changes that would affect their relationship with Mountain America, LLC.

140. Defendant Halperin agreed to the use of Mr. Berg's American Express account to be used for operations and improvement costs. As a part thereof, that card was used for Google and Yahoo advertising accounts. Upon information and belief, initially about 90% of sales, and then later about 50% during the height of the time period the project was being advertised in magazines and The Washington Post came from the Internet advertising. In the slow season, Internet related sales advertising accounts for approximately 70-80% of sales. Google & Yahoo charged a "click-though" rate for project sales customers that find the project through their search engine. It took approximately two months of work to set up all these various Internet ads (nearly 100 keywords each with a three line ad that optimized that keyword within the Google or Yahoo ad to allow it to be found). Mountain America, LLC was charged when its website was located found. The company was spending about $10,000 per month on these advertisements and the result was anywhere from two to ten sales per month. After getting the *ex parte* TRO to exclude Mr. Berg from the property, Defendant Halperin, with full knowledge that the extremely successful Internet ads would be canceled, caused the account from which Google and Yahoo were paid to be closed. Not only has their conduct

-25-

resulted in a decrease in sales opportunities, it also causes the LLC to waste website overhead costs.

141. The Mountain America, LLC agreement determines the rights and offices of the members, Plaintiff and Defendant.

142. Pursuant to the Mountain America, LLC contract, Mr. Halperin was at one time, but no longer is the LLC CEO (Mountain America, LLC agreement at ¶ 34: Jonathan Halperin shall be the Chief Executive Officer, and will be the financial decision maker on the project **until all second position loans have been repaid**" (emphasis added).

143. The second position loans have been repaid by Mountain America to Defendant. Mr. Halperin is only a 50% member. Even if the CEO title had survived the repayment of the second position loans, the CEO title was only an honorific that, in and of itself, conferred no additional authority upon Mr. Halperin other than the rights and responsibilities set forth specifically in the LLC agreement itself. *Id.* at ¶ 36 ("All material representations are set forth in this agreement"). So regardless of title, Mr. Halperin does not have any authority or responsibility, either to act unilaterally or to give advice and consent, over Mr. Berg's company decisions in regard to hiring and firing and suspending employees or consultants. Nothing in the LLC agreement restricts Mr. Berg's rights in this regard, and, in fact, the agreement prohibits Mr. Halperin from interfering with Mr. Berg's actions in this regard. *Id.* at ¶ 31.

144. Nothing in the LLC agreement places any obligation on Mr. Berg to first get Mr. Halperin's consent regarding employment or any other staff or project forces decisions. *Id.* The LLC agreement is absolutely clear in its delegation to Mr. Berg of the right and responsibility to direct Mountain America, LLC project forces – it is in Mr. Berg's complete control, and may not be interfered with by Mr. Halperin. Mr. Berg is obliged to remain in budget, and the dismissal or suspension of personnel who have refused to follow his legitimate business directions and who have outright refused to cooperate with him, to keep company matters confidential or to provide necessary company data and access to Mr. Berg is essential to his right and responsibility to direct company and project forces. Defendant disputes all of the foregoing contractual rights and responsibilities of Plaintiff, and disputes the limitations on his own contractual rights expressed in the Mountain America, LLC document.

145. Mr. Berg has informed William Goodwin, the company sales closing escrow agent, that he is ready, willing and able to complete all necessary company closings. He has requested certain information be provided to him by Mr. Goodwin pursuant to the Mountain America, LLC agreement whereby Mr. Berg solely is responsible for "closing coordination" as part of his unfettered right to direct and control project forces. Mountain America, LLC agreement at ¶ 30. Defendant disputes Plaintiff's contractual right and responsibility for closing coordination.

146.   Mr. Berg has not intended to impede the payment of any accurate or rightful invoice to the LLC; nevertheless, considering the misappropriation of his authority and the legal proceedings instituted by Defendant against him, Mr. Berg has felt it imperative to check all invoices for accuracy.

147.   The Mountain America, LLC method of operation has been, for nearly the entire project, for Mr. Berg and his staff under his control, to review, approve and prepare bills and checks. A spreadsheet totaling funds necessary to pay invoices is then prepared and given to Mr. Halperin. Mr. Halperin then has the responsibility to transfer the necessary funds, upon dual signatures with Mr. Berg, from the operating account to the construction control account. Then, Mr. Berg signs those construction control checks, with only Mr. Berg's signature necessary for the approved invoices. Although this regular business process has been impeded by the acts and omissions of Defendant Halperin, Mr. Berg has been doing his very best to ensure it moves forward timely. Defendant disputes the foregoing operational functions mandated by the LLC agreement.

148.   Upon information and belief, Mr. Gregory is purporting to speak for Mountain America at the direction of Defendant. Plaintiff disputes Defendant's contractual authority to allow Mr. Gregory or anyone else, including lawyers, to speak for Mountain America.

149.   Mr. Berg employed a new administrative assistant to perform administrative tasks for the company per his authority under the Mountain America, LLC agreement (¶¶ 30-31). This position is budgeted, and thus Mr. Berg has the authority to direct and control it as part of his absolute right to control project forces and to have a staff under his control. Moreover, although not contractually necessary, Mr. Halperin previously expressed his agreement with the hiring and an employment contract was vetted by company lawyers at the law firm of Jackson & Kelly. Nevertheless, Defendant now disputes Plaintiff's contractual authority to employ the administrative assistant.

150.   Defendant caused Mountain America to advertise on its website certain development-wide amenities, such the imminent development of a lake and lodge. Because of the lawsuit defendant has filed against the Plaintiff, Mountain America sales can not proceed because of the escrow agent's requirement that the parties disclose Defendant's litigation in the name of Mountain America and individually filed against the Plaintiff, and without sales, there is no capital to finish building the lodge or the lakes. This, by his abusive lawsuits, Defendant has jeopardized Mountain America's goodwill and exposed it to liability under 15 USC Sec. 1703 (a)(2)(D) and 24 CFR 1710.04©).

## COUNT I

### CLAIM FOR DECLARATORY JUDGMENT
### AND PRELIMINARY INJUNCTION

151.   All preceding paragraphs are incorporated by reference.

152.   Defendant has asserted that he has numerous powers under the parties Mountain America, LLC contract that he does not have.  He has gone forum shopping in an effort to get a court to provide him those illegitimate powers.

153.   Defendant has asserted that Plaintiff does not have the power or authority to control or direct company business that he, in fact, has the right, power and authority under the parties' Mountain America, LLC agreement, and Defendant has attempted to prevent Plaintiff from exercising his rights, powers and authority under the Mountain America, LLC agreement.

154.   On or about August 4, 2004, Plaintiff and Defendant entered into a written agreement that provided for the operation of a limited liability company called Mountain America.  A copy of the parties' contract is attached to this Complaint as Exhibit 1, and incorporated by reference.

155.   This is an action for declaratory judgment pursuant to Title 28, United States Code, § 2201, for the purpose of determining questions of actual controversy between the parties, as more fully appears herein.

156.   An actual controversy and dispute has arisen and now exists relating to the rights and duties of the parties to the above-entitled action, as expressed in the preceding subsequent paragraphs.

157.   An actual controversy has arisen and now exists between plaintiff and defendant regarding their respective rights and duties under the Mountain America, LLC contract, as set forth herein.

158.   A judicial declaration and preliminary injunction is necessary and appropriate at this time under all the circumstances so that plaintiff may determine plaintiff's and defendant's respective rights and duties under the Mountain America, LLC contract.

159.   Plaintiff needs the requested declarations in order to operate the company, and without such declarations the company may be deadlocked and unable to operate and be unable to fulfil its obligations to third parties and to its members and related LLCs.

160.   Plaintiff desires a declaration as to his rights and duties under the Mountain America, LLC agreement, and as to defendant's rights and duties under the same.  In particular, Plaintiff desires as follows:

    a1.   a declaration that Plaintiff may fire Mountain America staff without interference by Defendant;

    a2   a declaration the Plaintiff may hire staff without interference by Defendant if such hiring is within budget;

    b.   a declaration that he may determine where the operations, including its computers, books, work-papers and other records of Mountain America and other entities Mountain America controls may be located without interference by Defendant;

    c.   a declaration that he may change the locks and keep the business office in whatever manner he deems fit, without the interference of Defendant;

    d.   a declaration that he may direct the use of the Mountain America owned Mercedes G55 SUV, 1999 Range Rover, 2005 Dodge SR10 and Dodge 4x4 for project business without interference by Defendant;

    e.   a declaration that Plaintiff may direct all closing coordination for Mountain America, LLC property without interference by Defendant;

    f.   a declaration that Plaintiff may direct company sales information and sales interfacing without interference by Defendant;

    f.   a declaration that Plaintiff may direct the operation of the company and project website without interference by Defendant;

    g.   a declaration that Defendant must take all necessary actions to pay Mountain America's bills;

    h.   a declaration that Defendant may not cause Mountain America to sue Plaintiff as he has in Maryland and West Virginia state courts;

    I.   a declaration that defendant may not unilaterally terminate any Mountain America 1031 account exchange agreements without Plaintiff's concurrence and signature;

    j.   a declaration that Defendant may not unilaterally direct Mountain America expenditures;

-29-

k.    a declaration the Defendant must take all necessary action to avoid violation by Mountain America of 15 U.S.C. § 1703 (a) (2) (D), and 24 C.F.R. 1710.4 ©);

l.    a declaration that Plaintiff must dismiss the two state court lawsuits filed against Plaintiff and work together with Plaintiff toward the consummation of closings on land sales by Mountain America;

m.    a declaration that Defendant must take action to allow Plaintiff to be paid his salary draw by Mountain America;

n.    a declaration that Defendant may not assert or request any judicial body to prohibit Plaintiff from approaching within 800 meters of the Mountain America, LLC office located in Union, West Virginia;

o.    a declaration that Defendant may not "veto" hiring and firing decisions by Plaintiff of Mountain America employees or consultants;

p.    a declaration that Plaintiff may, unilaterally, and without interference by Defendant, take any and all actions to direct company and project employees, consultants, contractors and attorneys;

q.    a declaration that Defendant has no authority to countermand, impede or otherwise take any action whatsoever that may interfere with Plaintiff's directions to company employees, consultants, contractors and employees;

r.    a declaration that Plaintiff may choose a staff of his choice, to be under his control and direction, all free from interference by Defendant, to work on Mountain America project business;

s.    a declaration that Defendant may not singularly close land sales on behalf of Mountain America;

t.    a declaration that the Mountain America, LLC agreement between Plaintiff and defendant does not require Plaintiff to agree to any particular new projects;

u.    a declaration that the Mountain America, LLC agreement does not require Plaintiff to agree to terms for new projects demanded by Defendant;

v.    a declaration that the Mountain America, LLC agreement grants to Plaintiff unilateral authority to evaluate new projects;

w.    a declaration that the Mountain America, LLC agreement gives Plaintiff discretion whether to accept new company projects;

-30-

x.      a declaration that the Mountain America, LLC agreement states that any new project of the company may go forward only if such project is "mutually acceptable" to both members up to actual closing;

y.      a declaration that Defendant has no on-site powers or duties or authority for any Mountain America project;

z.      a declaration that Defendant is not entitled to a salary from Mountain America;

aa.     A declaration that the financial decision making power of Mountain America lies solely with Plaintiff, and that Defendant may not interfere with that power; however, Defendant must concur in such financial decisions;

bb.     A declaration that Defendant has no financial decision making power or authority for Mountain America except to concur or not concur in Plaintiff's decisions;

cc.     A declaration that both members of Mountain America must sign any document necessary to consummate a sale of Mountain America land;

dd.     A declaration that defendant may not act unilaterally to expend Mountain America monies;

ee.     A declaration that Plaintiff had no legal duty or obligation to agree to close on the Alderson property;

ff.     A declaration that Plaintiff has the right to operate any motor vehicles, equipment or utility and construction trailers owned by Mountain America, LLC and to possess the keys, titles and paperwork for said vehicles;

gg.     A declaration that Plaintiff has no obligation furnish keys to the Mountain America sales office to Defendant, to Ms. Linda shoupe, or to Robert Chamberland;

hh.     A declaration that plaintiff is entitled to operate the business of Mountain America anywhere of his choosing;

ii.     A declaration that Plaintiff has no obligation to keep company computers, e-mail access, computer passwords, telephones, telephone numbers, business equipment, scanners, copiers, GPS equipment, mapping software, any other software, business records, sales contracts, contracts with vendors or materialmen, or any other items at the company sales office in Union, West Virginia;

jj.     A declaration that Plaintiff has the right to control and direct and maintain media and digital content and business and e-mail records of the company, which are maintained

-31-

on a server operated by Crystal Tech, and that Plaintiff has no obligation to provide access to the same to Defendant or to Linda Shoupe or to Robert Chamberland for any purpose, specific or general, related to business e-mails, internet sales leads, and all other email traffic;

kk.    A declaration that Defendant has no right to unilaterally or otherwise direct Crystal Tech to do anything;

ll.    A declaration that Plaintiff has no obligation to provide to Defendant or Linda Shoupe or Robert Chamberland access to the Mountain America post office box in Union, West Virginia;

mm.    A declaration that neither Linda Shoupe may act as a fiduciary for Mountain America;

nn.    A declaration that neither Defendant nor Linda Shoupe nor Robert Chamberland may conduct any business affairs of Mountain America or Greentree without Plaintiff's express consent, nor may they interfere in any way with Plaintiff's conduct of the business affairs of those two entities;

oo.    A declaration that all of the relief sought by Defendant in his November 9, 2005 Motion for Temporary Restraining Order and for preliminary Injunction filed in the Circuit Court for Montgomery County, Maryland is in contravention of the Mountain America, LLC agreement, and is therefore invalid and unenforceable within this judicial district.

161.    Therefore, Plaintiff requests judgment as follows:

A declaration of the court for all of the declarations set forth in the preceding paragraph;

Attorney's fees and costs;

Damages for the diminution in value to the value of Mountain America caused by Defendant;

Such other and further relief as the court deems just and proper.

## COUNT II

## DECLARATORY JUDGMENT AND PRELIMINARY INJUNCTION

162.    Beginning on or about the month of October of 2005, and continuing to the present, defendant has wrongfully and unlawfully attempted to seize powers and authority over Mountain America operations that belong to Plaintiff, as set forth in the preceding paragraphs.

163. Plaintiff has demanded that defendant refrain from committing the above acts, but defendant has refused and continue to commit such acts, and will do so, unless this court immediately enjoins defendant from doing so.

164. As a result of Defendant's acts, Plaintiff has and will sustain great and irreparable injury, in that operational control of Mountain America will be taken from him.

165. Plaintiff cannot be fully compensated in damages, and is without an adequate remedy at law because the exact amount of damage plaintiff will sustain will be difficult to determine.

166. As a further result of defendant's acts, plaintiff has sustained money damages. If this court allows these acts to continue, plaintiff will be further damaged in an amount to proved at trial.

167. WHEREFORE, plaintiff requests judgment for:

To be restored to his rightful powers and authority, pursuant to the Mountain America and related LLC agreements; and that Defendant be enjoined from interfering with Plaintiff's authority and powers under their company LLC agreements; and all of the relief sought in declaration forum in paragraph 158 above according to proof; and that Defendant be ordered to stay 800 meters away from Plaintiff, and to return to the Mountain America office for lockup all company owned snake guns, his custom handgun, and any other firearm in his possession, and that he not be permitted to carry any firearm;

Damages against defendant according to proof at trial;

Costs of this action, and all other relief this court deems appropriate.

## COUNT III

### DEFENDANT'S BREACH OF FIDUCIARY DUTY AND USE OF OPPRESSIVE CONDUCT TO FREEZE OUT OR SQUEEZE OUT PLAINTIFF FROM MOUNTAIN AMERICA, LLC AND/OR REQUEST FOR JUDICIAL DISSOLUTION OF MOUNTAIN AMERICA, LLC

168. All preceding paragraphs are incorporated by reference.

169. To the extent required, Plaintiff Berg, a member of Mountain America, LLC, asserts under **Rule 23.1** of the **Federal Rules of Civil Procedure**, that to the extent that this action is derivative Plaintiff Berg has complied with **Rule 23.1**, of the **Federal Rules of Civil Procedure**, and that Mountain America, LLC has failed to enforce a rights, under the parties' Operating Agreement, that may properly be asserted by Mountain America, LLC wherein Plaintiff Berg was, and still is, a member at the time of the transaction of which Plaintiff Berg

complains, and that this action, to the extent derivative, is not a collusive one, to confer jurisdiction on a Court of the United States which it would not otherwise have. By reason of the foregoing allegations, and hereinafter, Plaintiff Berg asserts that he has attempted to maintain and lawfully obtain the peaceful, civil, and orderly transition of control of Mountain America, LLC, which he desires from the only other LLC member, Defendant Halperin, that his efforts to do so have been unsuccessful, and that further efforts to do so are futile, making judicial dissolution, winding up, and termination of Mountain America, LLC necessary.

170.   Defendant owes Plaintiff a duty not engage in oppressive conduct that departs from the standards of good faith and fair dealing that are inherent to every fiduciary relationship. Plaintiff Berg, a member of Mountain America, LLC asserts that it is not reasonably practicable to carry on the business of Mountain America, LLC in conformity with the articles of organization or the operating agreement, and therefore seeks a judicial decree of the dissolution, winding up, and termination of Mountain America, LLC for the protection of creditors, investors, and all others.

171.   Plaintiff has at all times been a member of Mountain America, LLC, including at all times all of the transactions described herein occurred.

172.   This action is not a collusive one to confer jurisdiction on this Court that it otherwise would not have.

173.   As described throughout this Complaint, Plaintiff repeatedly has attempted to work with the only other member of Mountain America, LLC, the Defendant, to accomplish company business. Defendant oppressively and unreasonably refuses to work in accord with the company operating agreement. It is patently obvious from the malicious tone of Defendant's pleadings filed in other litigation and as otherwise described herein that further efforts to persuade Defendant to live up to his obligations under the company operating agreement would be fruitless. Plaintiff requests judicial dissolution because it is not reasonably practicable to carry on the business of Mountain America in conformity with the articles of organization, ex. 3, or the operating agreement, ex. 1.

174.   Defendant owes Plaintiff a fiduciary duty by virtue of their contractual relationship expressed in the Mountain America, LLC agreement.

175.   Defendant owes Plaintiff a duty not engage in oppressive conduct that departs from the standards of good faith and fair dealing that are inherent to every fiduciary relationship.

176.   Defendant by his conduct described herein is attempting, for no legitimate business purpose, to freeze out or squeeze out Plaintiff and prevent him from deriving any benefit from Plaintiff's investment of time and money in Mountain America, LLC.

177.    WHEREFORE, Plaintiff requests judgment for the following forms of relief, either together or in the alternative, whichever may be found most appropriate:

(A) The entry of an order requiring dissolution and winding up of Mountain America and/or an order requiring such dissolution at a specified future date, to become effective only in the event that the members fail to resolve their differences prior to that date;

(B) The appointment of a receiver, not for the purposes of dissolution, but to continue the operation of the company for the benefit of all of the members, until differences are resolved or 'oppressive' conduct ceases;

(C) The appointment of a 'special fiscal agent' to report to the Court relating to the continued operation of the company, as a protection to its members, and the retention of jurisdiction of the case by the Court for that purpose;

(D) The retention of jurisdiction of the case by the Court for the protection of the members without appointment of a receiver or 'special fiscal agent;

(E) The ordering of an accounting by the Defendant for funds alleged to have been misappropriated;

(F) The issuance of an injunction to prohibit continuing acts of 'oppressive' conduct and which may include the reduction of salaries or bonus payments found to be unjustified or excessive;

(G) The ordering of affirmative relief by the entry of an order requiring the one member of Mountain America, LLC to purchase the stock of the other member, at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price;

(H) The ordering of affirmative relief by the entry of an order permitting Plaintiff to purchase an additional percentage of Mountain America, LLC under conditions specified by the court;

(I) An award of damages to Plaintiff as compensation for any injury suffered by him as the result of 'oppressive' conduct by the Defendant in the control or deadlock of the corporation;

Attorneys fees and costs;

Further relief as may appear just and proper.

## DEFAMATION, FALSE LIGHT, & INFLICTION OF EMOTIONAL DISTRESS

178.    All preceding paragraphs are incorporated by reference.

179.  On or about October 8, 2005 and thereafter, Defendant published and republished false statements of and concerning the Plaintiff in Kanawha County, West Virginia and elsewhere in the Southern District of West Virginia and elsewhere.

180.  The false statements were included in a "press release" that Defendant published to the media and business associates of Plaintiff.

181.  The false statements included the following:

"we have taken certain legal steps that are in the best interests of both the community and our company.  These steps include seeking an order from the Monroe County Circuit Court that will eventually eliminate Daniel Berg as a representative of our company in this community.

"Legal regulations will not permit me to provide full details as to the reasons Mr. Berg is no longer associated with our company."

182.  The press release is false and misleading because Defendant had not taken any "legal step" to seek an order from the Circuit Court of Monroe County to "eventually eliminate Daniel Berg as a representative of our company in the community."

183.  The press release is false and misleading because Defendant had not taken any legal steps in the best interest of the community, but only in his own private interest.

184.  The press release is false and misleading because Mr. Berg was still associated with the company.

185.  The press release is false and misleading because there were no "legal regulations" that did not permit Defendant to give whatever "details" to which he supposedly was referring; rather, this false and misleading statement was designed to falsely imply defamatory facts of a criminal nature of and concerning Plaintiff in order to harm Plaintiff's reputation.

186.  The press release was distributed to media organizations as part of an attempt to spread the defamation as widely as possible.

187.  Plaintiff is not a public figure.

188.  Plaintiff requested a retraction and apology.

189.  Defendant never published a retraction or issued an apology despite actual knowledge of the falsity of his publication as aforesaid.

190.  The press release is of and concerning Plaintiff.

-36-

## COUNT IV

## DEFAMATION *PER SE*

191. The statements and allegations set forth above are hereby incorporated by reference as if set forth verbatim.

192. The October 8, 2005 press release statements written and published by the Defendant in the Kanawha County, West Virginia and elsewhere in the Southern District of West Virginia and elsewhere, falsely implied Plaintiff had engaged in criminal conduct that "legal regulations" prevented Defendant from discussing, and is therefore actionable, *per se*.

193. The defamatory press release written and published by the Defendant, regarding the Plaintiff, was not privileged.

194. The defamatory press release written and published by the Defendants regarding the plaintiffs was widely published, and republished, in Kanawha County West Virginia and elsewhere in the Southern District of West Virginia and elsewhere.

195. The defamatory press release written and published by the Defendant specifically identified the Plaintiff.

196. The press release written and published by the Defendant made statements about and against Plaintiff that were not true.

197. As a result of the defamatory press release written and published by the Defendants, the Plaintiff has suffered substantial damage to his reputation, mental suffering and anguish, shock, horror, shame, humiliation, embarrassment, anger, chagrin, annoyance, emotional distress, and other pecuniary injuries.

198. As a result of the Defendant's defamation *per se*, the Plaintiff demands judgment against the Defendant for compensatory and punitive damages, as well as any and all other relief the Court deems just and proper.

## COUNT V

## NEGLIGENT PUBLICATION OF DEFAMATORY MATERIAL

199. The statements and allegations set forth above in this Complaint are hereby incorporated by reference as if set forth verbatim.

200. The press release written and published by the Defendant is defamatory, in that it harmed Plaintiff's reputation, lowered him in the estimation of the community, deterred people from

associating or dealing with him, and reflected shame, contumely, and disgrace upon the Plaintiff.

201.   The defamatory press release written and published by the Defendant regarding the Plaintiffs was not privileged.

202.   The defamatory press release written and published by the Defendant, regarding the Plaintiff was widely published, including publication in Kanawha County, West Virginia.

203.   The defamatory press release written and published by the Defendant, specifically identified the Plaintiff.

204.   The press release written and published by the Defendant, made statements about and against Plaintiff that were not true.

205.   The Plaintiff was not a public official or public figure, as he held no office, assumed no role of special prominence in the affairs of society, did not thrust himself to the forefront of a particular public controversy, and was a private person for purposes of the press release written and published by the Defendant.

206.   Defendant was negligent in writing and publishing the defamatory press release, and failed to exercise due care in ascertaining the truth of the defamatory statements made regarding the Plaintiff.

207.   As a result of the defamatory press release written and published by the Defendant, the Plaintiff has suffered substantial damage to his reputation, mental suffering and anguish, shock, horror, shame, humiliation, embarrassment, anger, chagrin, annoyance, emotional distress, and other pecuniary injuries.

208.   As a result of the Defendant's negligent publication of defamatory material, the Plaintiff demands judgment against the defendants for compensatory and punitive damages, as well as any and all other relief the Court deems just and proper.

## COUNT VI

## RECKLESS PUBLICATION OF DEFAMATORY MATERIAL

209.   The statements and allegations set forth above in this Complaint are hereby incorporated by reference as if set forth verbatim.

210.   The press release written and published by the Defendant about the Plaintiff is defamatory in that it harmed his reputation, lowered it in the estimation of the community, deterred people

from associating or dealing with him, and reflected shame, contumely, and disgrace upon the Plaintiff.

211.   The defamatory press release written and published by the defendant regarding the Plaintiff was not privileged.

212.   The defamatory press release written and published by the defendant regarding the Plaintiff was widely published, including publication in Kanawha County, West Virginia.

213.   The defamatory press release written and published by the defendant specifically identified the plaintiff.

214.   The press release written and published by the defendant made allegations about and against plaintiff that were not true.

215.   The defendant wrote and published the defamatory statements (a) with knowledge that said statements were false or misleading, and/or (b) with reckless disregard for their truth or falsehood.

216.   Defendant intended to injure plaintiffs through the knowing and/or reckless publication of the defamatory statements in the press release described above.

217.   As a result of the defamatory press release written and published by the defendant, the plaintiff has suffered substantial damage to his reputation, mental suffering and anguish, shock, horror, shame, humiliation, embarrassment, anger, chagrin, annoyance, emotional distress, and other pecuniary injuries.

218.   As a result of the defendant's malicious, intentional, and reckless publication of defamatory material, the plaintiff demands judgment against the defendant for compensatory and punitive damages, as well as any and all other relief the Court deems just and proper.

## COUNT VII

## FALSE LIGHT INVASION OF PRIVACY

219.   The statements and allegations set forth above in this Complaint are hereby incorporated by reference as if set forth verbatim.

220.   The press release written and published by the defendants, as well as, upon information and belief, other statements by Defendant about the Plaintiff, constituted publicity that unreasonably placed Plaintiff in a false light before the public.

221.    The press release written and published by the defendant, as well as, upon information and belief, other statements by Defendant regarding the Plaintiff were not privileged.

222.    The press release written and published by the defendant as well as, upon information and belief, other statements by Defendant regarding the Plaintiff were widely published, including publication in Kanawha County, West Virginia and elsewhere in the Southern District of West Virginia and elsewhere.

223.    Through the press release written and published by the defendant and otherwise, the defendant has disclosed private and/or confidential facts about plaintiff in which the general public had no legitimate interest.

224.    The press release written and published by the defendant, as well as, upon information and belief, other statements by Defendant about the plaintiff, specifically referred to the plaintiff, and the statements contained therein would be highly offensive to a reasonable person.

225.    The press release written and published by the defendant, as well as, upon information and belief, other statements by Defendant about the plaintiff, made statements about and against plaintiff that were not true, and unreasonably placed him in a false light before the public.

226.    The Defendant wrote and published the press release, as well as, upon information and belief, other statements by Defendant about the plaintiff,  negligently, and/or with knowledge that the statements in the press release and otherwise, were false or misleading, or with reckless disregard of their truth or falsehood.

227.    As a result of the press release written and published by the defendant, as well as, upon information and belief, other statements by Defendant about the plaintiff, the plaintiff was unreasonably placed in a false light before the public, and he has suffered mental suffering and anguish, shock, horror, shame, humiliation, embarrassment, anger, chagrin, annoyance, emotional distress, and other pecuniary injuries, separate and apart from any injury to reputation.

228.    As a result of the defendant's negligent, malicious, intentional, and/or reckless publication of statements that placed the plaintiff in a false light before the public, the plaintiff demands judgment against the defendant for compensatory and punitive damages, as well as any and all other relief the Court deems just and proper.

## COUNT VIII

## INTENTIONAL/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

229.    The statements and allegations set forth above in this Complaint are hereby incorporated by reference as if set forth verbatim.

-40-

230.   The press release written and published by the defendants, purposefully held up the plaintiff to public ridicule and humiliation.

231.   The conduct of the defendant in making false statements without conducting any reasonable inquiry, coupled with his refusal to issue a retraction or apology or conduct a reasonable inquiry after being informed by plaintiff that statements in the press release were false, constituted conduct so atrocious, intolerable, and outrageous in character and so extreme in degree as to go beyond all bounds of decency, and constituted intentional or negligent infliction of emotional distress.

232.   As a result of the press release written and published by the defendant, plaintiff suffered substantial damage to his reputation, mental suffering and anguish, shock, horror, shame, humiliation, embarrassment, anger, chagrin, annoyance, emotional distress, and other pecuniary injuries.

233.   As a result of the defendant's intentional or negligent tortious infliction of emotional distress, the plaintiff demand judgment against the defendant for compensatory and punitive damages, as well as any and all other relief the Court deems just and proper.

## COUNT IX

## ABUSE OF PROCESS

234.   Plaintiff incorporates herein all the allegations contained above in this Complaint, the same as if fully recited herein.

235.   Defendant filed a motion for temporary restraining order in West Virginia state court against Plaintiff, but not a Complaint.

236.   Defendant sought and was granted an *ex parte* hearing on his motion for a temporary restraining order in West Virginia state court.

237.   Defendant, a lawyer, did not notify, or cause his own counsel to notify, Plaintiff's counsel, even though he knew Plaintiff had counsel and had communicated with Plaintiff's counsel in the days prior to seeking an *ex parte* hearing in on his Motion for Temporary Restraining order filed in West Virginia state court.

238.   Defendant filed the West Virginia state court proceeding on October 6, 2005 not for a legitimate purpose, but for the express purpose of intimidating Defendant and to deprive him of his ability to exercise his rights as a member of Mountain America, LLC, as part of his wrongful effort to squeeze out and freeze out plaintiff from Mountain America, LLC.

-41-

239. Defendant acted wilfully by filing the West Virginia state court proceeding for the ulterior and improper purpose of intimidating and squeezing out and freezing out Plaintiff from Mountain America, LLC.

240. The true purpose of Defendant's institution of the proceeding in West Virginia state court, as shown by his October 8, 2005 press release, was to eliminate Plaintiff as a member of Mountain America, LLC and from the Walnut Springs project, thereby depriving Plaintiff of the value of his investment of time and money in the project.

241. The filing of the proceeding against Plaintiff and the use of official process to serve the improperly obtained *ex parte* temporary restraining order on him caused by Defendant was for an improper purpose that constitutes an abuse of process, to which Plaintiff is entitled to damages, including his attorney fees incurred in defending against the claims made in Defendant's proceeding.

242. WHEREFORE, Plaintiff prays as follows:

   A.   That the Court award compensatory and punitive damages, as well as equitable relief to Plaintiff on this claim;

   B.   That the Court grant Plaintiff his attorneys' fees and costs;

   C.   That the cost of this action be taxed against the Defendant; and

   D.   That the Court grant Defendant such other relief as the Court may deem appropriate.

## COUNT X

## CIVIL CONSPIRACY

243. Plaintiff incorporates by reference all the previous and subsequent allegations in this Complaint.

244. The Defendant conspired through the concerted actions of his agents and employees to commit and did commit wrongful acts as set forth herein above to the injury of the Plaintiff.

245. The Defendant conspired through the concerted actions of his agents and employees to commit and did commit lawful acts in an unlawful manner as set forth above, to the injury of the Plaintiff, for all of which Plaintiff is entitled to compensatory and punitive damages.

## COUNT XI

## MAIL FRAUD/BREACH OF FIDUCIARY DUTY

-42-

246. Plaintiff incorporates by reference all the previous and subsequent allegations in this Complaint.

247. On October 12, 2005 Defendant fraudulently signed three separate documents falsely stating he was "authorized" to revoke three "exchange agreements" entered into by both Plaintiff and Defendant.    Each of the three documents are entitled "Revocation of Section 1031–Exchange Agreement", and are witnessed by Linda Shoupe. Ms. Shoupe was acting pursuant to the direction and control of Defendant.

248. The three fraudulent revocations are attached hereto as part of Ex. 31.

249. The three separate revocations were fraudulently signed, and the revocations fraudulently effected, and possession wrongfully and fraudulently obtained by the Defendant, all without the authorization of Plaintiff.

250. Signature authorization by the Plaintiff was legally required before Defendant could legally be authorized to revoke the exchange agreements.

251. One of the three revocations fraudulently signed and effected by Defendant on October 12, 2005 states as follows:

"REVOCATION OF SECTION 1031—EXCHANGE AGREEMENT

I, JONATHAN HALPERIN trading as MOUNTAIN AMERICA, LLC, 5009 McArthur Court, N.W., Washington, DC 20015, by Exchange Agreement executed on the 31st day of August 2005, appointing Holcomb & Straile, LLC, our Qualified Intermediary and with the responsibilities and powers set forth, as more fully appears by reference to the Exchange Agreement concerning the Section 1031of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated under Section 1031, as amended with regards to the Feroz Alloo, Sumaiya Alloo, Sivasubramaniam Rajaram Pandian, and Malvika Sivasubramaniam Pandian property identified as 6.27 acres ±, Horizon Woods Forest Estate II, located in Union, West Virginia (hereinafter "Exchange Agreement").

Notice is now given that, I, Jonathan Halperin, authorized manager of Mountain America, LLC, by this instrument hereby REVOKE the revoke the Exchange Agreement, and demand the immediate release of the $91,632.04. I, Jonathan Halperin acknowledge that by revoking the Exchange Agreement and taking possession of the sale proceeds from the sale of the Feroz Alloo, Sumaiya Alloo, Sivasubramaniam Rajaram Pandian, and Malvika Sivasubramaniam Pandian property identified as 6.27 acres ±, Horizon Woods Forest Estate II, located in Union, West Virginia that the members of Mountain America, LLC are waiving any further right to identify this transaction as a Section 1031 exchange and that we are liable for all capital gains taxes incurred from the sale."

Another revocation fraudulently signed, entered into and effected by Defendant states as follows:

"REVOCATION OF SECTION 1031—EXCHANGE AGREEMENT

-43-

"I, JONATHAN HALPERIN trading as MOUNTAIN AMERICA, LLC, 5009 McArthur Court, N.W., Washington, DC 20015, by Exchange Agreement executed on the 31st day of August 2005, appointing Holcomb & Straile, LLC, our Qualified Intermediary and with the responsibilities and powers set forth, as more fully appears by reference to the Exchange Agreement concerning the Section 1031of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated under Section 1031, as amended with regards to the William P. Farley and Christine H. Farley property identified as 7.06 acres ±, Horizon Woods Forest Estates VII, located in Union, West Virginia (hereinafter "Exchange Agreement").

Notice is now given that, I, Jonathan Halperin, authorized manager of Mountain America, LLC, by this instrument hereby REVOKE the revoke the Exchange Agreement, and demand the immediate release of the $83,392.38. I, Jonathan Halperin acknowledge that by revoking the Exchange Agreement and taking possession of the sale proceeds from the sale of the William P. Farley and Christine H. Farley property identified as 7.06 acres ±, Horizon Woods Forest Estates VII, located in Union, West Virginia that the members of Mountain America, LLC are waiving any further right to identify this transaction as a Section 1031 exchange and that we are liable for all capital gains taxes incurred from the sale."

The last revocation fraudulently effected by Defendant on October 12, 2005 states as follows:

## REVOCATION OF SECTION 1031—EXCHANGE AGREEMENT

"I, JONATHAN HALPERIN trading as MOUNTAIN AMERICA, LLC, 5009 McArthur Court, N.W., Washington, DC 20015, by Exchange Agreement executed on the 31st day of August 2005, appointing Holcomb & Straile, LLC, our Qualified Intermediary and with the responsibilities and powers set forth, as more fully appears by reference to the Exchange Agreement concerning the Section 1031of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated under Section 1031, as amended with regards to the Hee Soo Roh and Kisok Roh property identified as 6.88 acres ±, Sunrise Hills, Estate No. III, located in Union, West Virginia (hereinafter "Exchange Agreement").

"Notice is now given that, I, Jonathan Halperin, authorized manager of Mountain America, LLC, by this instrument hereby REVOKE the revoke the Exchange Agreement, and demand the immediate release of the $65,650.29. I, Jonathan Halperin acknowledge that by revoking the Exchange Agreement and taking possession of the sale proceeds from the sale of the Hee Soo Roh and Kisok Roh property identified as 6.88 acres ±, Sunrise Hills, Estate No. III, located in Union, West Virginia that the members of Mountain America, LLC are waiving any further right to identify this transaction as a Section 1031 exchange and that we are liable for all capital gains taxes incurred from the sale."

The total amount of money Defendant fraudulently took possession of by virtue of the foregoing three fraudulent revocations was $240,674.71.

252.   Also on October 12, 2005, Defendant fraudulently signed a document entitled "Termination of Section 1031 - Exchange Agreement". This document too was witnessed by Linda Shoupe, who was acting at the direction and control of Defendant.

-44-

253.  The "Termination" was fraudulently signed, and the termination fraudulently effected, and possession wrongfully and fraudulently obtained by the Defendant, without the authorization of Plaintiff.

254.  Signature authorization by the Plaintiff was legally required before Defendant could legally be authorized to terminate the exchange agreement.

255.  The termination fraudulently signed and effected by Defendant on October 12, 2005, ex. 31, states as follows:

"**TERMINATION OF SECTION 1031—EXCHANGE AGREEMENT**

"I, JONATHAN HALPERIN trading as MOUNTAIN AMERICA, LLC, 5009 McArthur Court, N.W., Washington, DC 20015, by Exchange Agreement executed on the 22nd day of July 2005, appointing Holcomb & Straile, LLC, our Qualified Intermediary and with the responsibilities and powers set forth, as more fully appears by reference to the Exchange Agreement concerning the Section 1031 of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated under Section 1031, as amended with regards to a portion of the Dale A. Enzor property identified as 7.84 acres, Sunrise Hills Estate 6, located in Union, West Virginia (hereinafter "Exchange Agreement"). Mountain American, LLC has already purchased a replacement property using the proceeds from the Dale A. Enzor transaction, which has been earlier identified and is withdrawing the remaining proceeds of $76,001.47.

"Notice is now given that, I, Jonathan Halperin, authorized manager of Mountain America, LLC, by this instrument hereby TERMINATE the Exchange Agreement, and demand the immediate release of the remaining proceeds $76,001.47. I, Jonathan Halperin acknowledge that by withdrawing the remaining proceeds of the transaction identified as the Dale A. Enzor property identified as 7.84 acres, Sunrise Hills Estate 6, located in Union, West Virginia, that the members of Mountain America, LLC are subject to capital gains tax on this amount."

256.  Pursuant to the fraudulently signed and effected termination document, Defendant fraudulently took possession of $76,001.47.

257.  The exchange agreements that the foregoing revocations and termination applied to were signed by both Plaintiff and Defendant. Defendant's actions violated and breached section 5.6©) of the exchange agreements.

258.  The exchange agreements that the foregoing revocations and terminations applied to allow Plaintiff and Defendant a number of different options relating to termination and/or revocation. One such option would be to exchange the proceeds for a different property. Another option would be to split the transaction proceeds and distribute half each to Plaintiff and Defendant individually. By his fraudulent conduct, Defendant deprived Plaintiff of his rights to those other options.

259.  Defendant's conduct violates the federal mail and/or wire fraud statutes because it was conveyed through mail or wire.

-45-

260. Defendant's fraudulent assertion of authority to commandeer the exchange account proceeds was a false representation of material fact. Defendant made that fraudulent assertion intentionally and knowingly. Defendant intended to so mislead the holder of the exchange account as to his authority in order to fraudulently take possession of the proceeds in the four exchange accounts. The holder of the exchange accounts, Mr. Craig Holcomb relied upon Defendant's fraudulent and false misrepresentation of Defendant's authority. And, as stated above, the fraud damaged Plaintiff because he was thereafter deprived of his right to choose other potential options for the use of those proceeds, such as a different exchange or a distribution. Plaintiff also is damaged by the fraud because he now potentially is liable for capital gains taxes.

261. The Defendant's fraudulent termination and revocations described above were part of his scheme to defraud Plaintiff of his rights as a member of Mountain America, LLC and as part of his scheme to squeeze out or freeze out Plaintiff as a member. Defendant and Ms. Linda Shoupe, who was acting under Defendant's direction and control, used mail or wire communications in furtherance of those schemes. For all of which Plaintiff is entitled to damages and equitable relief.

## COUNT XII

## RICO

262. This claim arises under § 1964(c) of RICO, and Plaintiff asserts claims for violations of § 1962(c) and (d) of RICO.

263. At all times relevant hereto, both the Defendant and Plaintiff are and have been a "person" as that term is defined in § 1961(3) of RICO.

264. In violation of § 1962(c) and (d), the Defendant conducted or participated and/or conspired to conduct or participate, directly or indirectly, in the conduct of certain enterprises' affairs through a pattern of racketeering activity, thereby proximately causing injury to Plaintiff's business or property. The Defendant knew the essential nature and scope of the enterprise or enterprise(s) that he employed by or associated with, and the Defendant intended to participate in the affairs of the particular enterprise or enterprise(s).

265. In accordance with Fed. R. Civ. P. 8(e)(2), Plaintiff alleges that there have existed at least the following "enterprise(s)," as that term is defined in § 1961(4) of RICO, and the Defendant committed, aided and abetted, and/or conspired to commit violations of §

1962(c):

The Association-in-Fact-Enterprise: There existed an Association-in-Fact-Enterprise consisting of Defendant Jonathan Halperin, Linda Shoupe and Robert Chamberland, which is referred to herein as the "Association-in-Fact-Enterprise". Each of the members of the Association-in-Fact-Enterprise are persons or legally incorporated entities that conducted (and conduct) business activities through the United States and overseas. The activities of the Association-in-Fact-Enterprise affected interstate or foreign commerce. The members of that enterprise continue their professional and business activities. As alleged above in this Complaint, the members of the Association-in-Fact-Enterprise performed separate, discrete roles in conceiving and carrying out the schemes to defraud alleged herein, and they made decisions on a hierarchical and consensual basis. The Association-in-Fact-Enterprise had a hierarchical decision-making structure headed by the Defendant. The Association-in-Fact-Enterprise also had a consensual decision making structure because the members of that enterprise voluntarily agreed to join the enterprise and played an active role in its affairs. Each of them was motivated by the desire to receive payments derived from the schemes to defraud. The members of that enterprise conducted and/or conspired to conduct the affairs of the Association-in-Fact-Enterprise through a "pattern of racketeering activity," as that term is defined in § 1961(1) and (5) or RICO. The defendants identified in this paragraph committed, aided and abetted and/or conspired to commit violations of the following provisions of Title 18 of the U.S. Code: §§ 1341 and 1343 (mail and wire fraud); . The Defendant's acts of "racketeering activity" are alleged above, including but not limited to paragraphs 47 and 48 of this Complaint.

266.   The Mountain America Enterprise: Mountain America was a RICO enterprise for the time period it was adversely dominated by Defendant and his co-conspirators, Linda Shoupe and Robert Chamberland, and it is referred to herein as the "Mountain America Enterprise." Mountain America is a Maryland corporation with its principal place of business located in Union, West Virginia. At all times relevant hereto, the activities of the Mountain America Enterprise affected interstate or foreign commerce. The Defendant was a member of Mountain America, and adversely dominated the financial decision making of the Mountain America Enterprise. In violation of § 1962(c) of RICO, the Defendant and Ms. Shoupe conducted and/or conspired to conduct the affairs of the Mountain America Enterprise through a "pattern of racketeering activity," as that term is defined in § 1961(1) and (5) of RICO. The Defendant committed, aided and abetted and/or conspired to commit violations of the following provisions of Title 18 of the U.S. Code: §§ 1341 and 1343 (mail and wire fraud). The Defendant's acts of "racketeering activity" also are alleged in paragraphs 47 and 48 and Count XI of this Complaint.

267.   The Defendant committed, aided and abetted and/or conspired to commit violations of the federal mail and wire fraud statutes, 18 U.S.C.A. §§ 1341 and 1343 and engaged in more

than one "act act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year," namely the emails with Linda Shoupe on September 7, 2005, where he discussed his plan to shoot Plaintiff. Defendant has also been motivated in his racketeering activity by his desire to retaliate against Plaintiff for Plaintiff's blunt discussions of his concern about Defendant's substance abuse. These offenses and violations of federal and state law constituted a "pattern of racketeering activity," as that term is defined in 18 U.S.C.A. § 1961(1) and (5). Violations of §§ 1341 and 1343 — Use of United States mail and/or Interstate and International Wire Facilities are set forth as follows:

The pattern of racketeering committed and/or aided and abetted by the Defendant involves at least one instance of using the United States mail and/or interstate and international wire facilities in furtherance of the unlawful scheme in order to:

(I) convince Mountain America's Qualified Intermediary, Craig Holcomb, to terminate and revoke certain exchange agreement monies and turn possession of same over to Defendant;

(ii) deprive Plaintiff of his right to have a vote on whether to revoke or terminate the exchange agreements and prevent Defendant from exercising his right to have a vote over how the exchange account monies should be used or directed or distributed;

(iii) to weaken Plaintiff's power and authority over Mountain America operations as part the scheme to freeze out or squeeze out defendant from Mountain America.

Defendant's violation of §§ 1341 and 1343 include the false representations explained in Count XI, above. The use of the US. Mail or the interstate wire facilities constitutes a separate violation of 18 U.S.C.A. § 1341 or 18 U.S.C.A. § 1343. Defendant's plot to shoot Plaintiff as described in paragraphs 47 and 48 falls within the parameter of 18 U.S.C. § 1961(1)(A), as does his retaliation against Plaintiff for Plaintiff's blunt discussion of his concern about Defendant's substance abuse.

268.    Defendants' violations of 18 U.S.C.A. §§ 1341 or 1343, and his plan to shoot Plaintiff as discussed in his email of September 7, 2005, and retaliation against Plaintiff for Plaintiff's blunt discussion of his concern about Defendant's substance abuse constituted a "pattern of racketeering activity," as that term is defined in § 1961(1) and (5) of RICO, because the acts were related to each other and had continuity. As alleged herein, Defendant's

violations of these statutes had the same or similar purposes, results, participants, victims, or methods of commission; they were interrelated and not isolated events. Defendants' violations of these federal statutes and state law concerning shooting people and murder, and narcotics, and thus evidenced continuity because they amounted to a closed period of repeated conduct or conduct that extended temporally from the past into the future with a threat of repetition.

269.   Plaintiff has standing to sue under RICO because he is a person who has been injured in his business or property by reason of Defendant's violations of § 1962©) and (d) of RICO, as set forth above.  Pursuant to § 1964(c) of RICO, Plaintiff is entitled to assert this claim and to recover threefold the damages sustained and the costs of bringing suit, including reasonable attorney's fees.

## COUNT XIII

## BREACH OF CONTRACT

270.   Plaintiff incorporates by reference all the previous and subsequent allegations in this Complaint.

271.   Defendant repeatedly has interfered with and attempted to countermand and change Plaintiff's directives on the use of project forces and materials, in breach of the terms of the Mountain America, LLC agreement.

272.   Defendant, by his wrongful interference and challenges and countermands of Plaintiff's directions has caused Mountain America to be devalued substantially and to incur debts it otherwise would not have incurred, devaluation and debts that, by virtue of his 50% membership in Mountain America, Plaintiff is liable.

273.   Wherefore, Plaintiff requests judgment against the defendant for breach of contract for the amount of the devaluation of the company as a result of Defendant's wrongful interference as aforesaid, and for the amount of all debts Mountain America is obliged to pay by virtue of Defendant's wrongful interference.

## COUNT XIV

## BREACH OF CONTRACT AND/OR FIDUCIARY DUTY
## CONCERNING SUNRISE MOUNTAIN, LLC

274. Plaintiff incorporates by reference all the previous and subsequent allegations in this Complaint.

275. In or about May or June of 2005 there was an 18 acre parcel of land the purchase of which Plaintiff personally negotiated for the amount of $40,000.

276. Plaintiff paid the deposit of $5,000 personally, and made it available to Mountain America per the parties' operating agreement contract for Mountain America.

277. Plaintiff and Defendant agreed that Ester Halperin, Defendant's mother, would become an investor related to that purchase.

278. The parties agreed that a new LLC would be created to be called Sunrise Mountain LLC; they agreed also that the members of Sunrise Mountain, LLC would be as follows: 1/3 membership for Ester Halperin, and 2/3 membership for Mountain America/ Plaintiff and Defendant. The parties agreed further that the same operational terms would be in the Sunrise Mountain, LLC agreement as were in the other LLC agreements.

279. Ester Halperin was delayed in completing paperwork for a loan relating to this purchase of land, so Plaintiff agreed to personally pay cash and to be reimbursed a week or so later when Defendant's mother funded her loan.

280. By the time of the closing, however, both the Defendant personally and Mountain America needed funds. Defendant could not give the company the needed funds for payroll and other commitments because he had hundreds of thousands of dollars in revolving credit charges. Therefore, Plaintiff, in a good faith effort to help both the company and Defendant, went without any salary compensation for four months. That salary compensation finally was paid at the end of September in a lump sum, but no salary has been paid to Plaintiff since that time and Defendant has refused to respond to repeated requests to distribute company funds necessary to pay Plaintiff's salary and expenses.

281. Defendant has refused enter into a Sunrise Mountain, LLC as the parties had agreed.

282. Defendant's refusal to pay Plaintiff's salary, his refusal to formally enter into the Sunrise

-50-

Mountain, LLC agreement, and his refusal to reimburse Plaintiff for money Plaintiff expended personally in this regard is a breach contract and/or a breach of fiduciary duty.

283.    As a result of Defendant's conduct stated herein, Plaintiff is entitled to damages.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

                                                        **DANIEL BERG, Plaintiff**

                                                                *By counsel*

Rudolph L. DiTrapano (WVSB#1024)
Sean P. McGinley (WVSB#5836)
**DiTRAPANO, BARRETT & DiPIERO, PLLC**
604 Virginia St., E.
Charleston, WV 25301
(304) 342-0133 telephone
(304) 342-4605 facsimile

and

Carl J. Roncaglione, Jr.
Attorney at Law
1018 Kanawha Blvd. East
Suite 401 Boulevard Tower
Charleston, WV 25301
(304) 342-3945 phone
(304) 342-3947 fax
Counsel for Plaintiff

11-10-05   12:52      FROM-CALIFORNIA BANK & TRUST GOLDEN TRIANGLE      +8586224828            T-917   P.01/01   F-823

# VERIFICATION

State of California

County of San Diego, to-wit:

I, Daniel Berg, having been placed under oath, do hereby verify that the facts alleged in the attached **COMPLAINT** are true, and to the extent that any of the facts are based upon information and belief, I believe them to be true.

Further, this affiant sayeth naught.



Daniel Berg

Taken, subscribed and sworn to before the undersigned Notary Public this 10th day of November, 2005.

My commission expires _____ September 2, 2009 _____.

(SEAL)

JESSICA HINFEY
Commission # 1603908
Notary Public - California
San Diego County
My Comm. Expires Sep 2, 2009

_____
NOTARY PUBLIC